(Slip Opinion)       OCTOBER  TERM,  2004       1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## SAN REMO HOTEL, L. P., ET AL. *v.* CITY AND COUNTY OF SAN FRANCISCO, CALIFORNIA, ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 04–340.   Argued March 28, 2005—Decided June 20, 2005

Petitioners, hoteliers in respondent city, initiated this litigation over
the application of an ordinance requiring them to pay a $567,000 fee
for converting residential rooms to tourist rooms.  They initially
sought mandamus in California state court, but that action was
stayed when they filed suit in Federal District Court asserting, *inter
alia*, facial and as-applied challenges to the ordinance under the Fifth
Amendment's Takings Clause.  Although the District Court granted
the city summary judgment, the Ninth Circuit abstained from ruling
on the facial challenge under *Railroad Comm'n of Tex.* v. *Pullman
Co.*, 312 U. S. 496, because the pending state mandamus action could
moot the federal question.  The court did, however, affirm the District
Court's ruling that the as-applied claim was unripe.  Back in state
court, petitioners attempted to reserve the right to return to federal
court for adjudication of their federal takings claims.  Ultimately, the
California courts rejected petitioners' various state-law takings
claims, and they returned to the Federal District Court, advancing a
series of federal takings claims that depended on issues identical to
those previously resolved in the state courts.  In order to avoid being
barred from suit by the general rule of issue preclusion, petitioners
asked the District Court to exempt their federal takings claims from
the reach of the full faith and credit statute, 28 U. S. C. §1738.  Rely-
ing on the *Williamson County Regional Planning Comm'n* v. *Hamil-
ton Bank of Johnson City*, 473 U. S. 172, 195, holding that takings
claims are not ripe until a State fails "to provide adequate compensa-
tion for the taking," petitioners argued that, unless courts disregard
§1738 in takings cases, plaintiffs will be forced to litigate their claims
in state court without any realistic possibility of ever obtaining fed-

eral review.  Holding, *inter alia,* that petitioners' facial attack was barred by issue preclusion, the District Court reasoned that §1738 requires federal courts to give preclusive effect to any state-court judgment that would have such effect under the State's laws.  The court added that because California courts had interpreted the relevant substantive state takings law coextensively with federal law, petitioners' federal claims constituted the same claims the state courts had already resolved.  Affirming, the Ninth Circuit rejected petitioners' contention that general preclusion principles should be cast aside whenever plaintiffs must litigate in state court under *Pullman* and/or *Williamson County.*

*Held:* This Court will not create an exception to the full faith and credit statute in order to provide a federal forum for litigants seeking to advance federal takings claims.  Pp. 11–23.

　　(a) The Court rejects petitioners' contention that whenever plaintiffs reserve their federal takings claims in state court under *England* v. *Louisiana Bd. of Medical Examiners*, 375 U. S. 411, federal courts should review the reserved federal claims *de novo*, regardless of what issues the state court may have decided or how it may have decided them.  The *England* Court's discussion of the "typical case" in which reservations of federal issues are appropriate makes clear that the decision was aimed at cases fundamentally distinct from petitioners'.  *England* cases generally involve federal constitutional challenges to a state statute that can be avoided if a state court construes the statute in a particular manner.  *Id.,* at 420.  In such cases, the purpose of abstention is not to afford state courts an opportunity to adjudicate an issue that is functionally identical to the federal question, but to avoid resolving the federal question by encouraging a state-law determination that may moot the federal controversy.  See *id.*, at 416–417, and n. 7.  Additionally, the Court made clear that the effective reservation of a federal claim was dependent on the condition that plaintiffs take no action to broaden the scope of the state court's review beyond deciding the antecedent state-law issue.  *Id.,* at 419.  Because the Ninth Circuit invoked *Pullman* abstention after determining that a ripe federal question existed as to the petitioners' facial takings challenge, they were entitled to insulate from preclusive effect that one federal issue while they returned to state court to resolve their mandamus petition.  Petitioners, however, chose to advance broader issues than the limited ones in the mandamus petition, putting forth facial and as-applied takings challenges to the city ordinance in their state action.  By doing so, they effectively asked the state court to resolve the same federal issue they had previously asked it to reserve.  *England* does not support the exercise of any such right.  Petitioners' as-applied takings claims fare no better.

Syllabus

The Ninth Circuit found those claims unripe under *Williamson County,* and therefore affirmed their dismissal. They were never properly before the District Court, and there was no reason to expect that they could be relitigated in full if advanced in the state proceedings. Pp. 11–17.

(b) Federal courts are not free to disregard §1738 simply to guarantee that all takings plaintiffs can have their day in federal court. Petitioners misplace their reliance on the Second Circuit's *Santini* decision, which held that parties who are forced to litigate their state-law takings claims in state court pursuant to *Williamson County* cannot be precluded from having those very claims resolved by a federal court. The *Santini* court's reasoning is unpersuasive for several reasons. First, both petitioners and *Santini* ultimately depend on an assumption that plaintiffs have a right to vindicate their federal claims in a federal forum. This Court has repeatedly held to the contrary. See, *e.g., Allen* v. *McCurry*, 449 U. S. 90, 103–104. Second, petitioners' argument assumes that courts may simply create exceptions to §1738 wherever they deem them appropriate. However, this Court has held that no such exception will be recognized unless a later statute contains an express or implied partial repeal. *E.g., Kremer* v. *Chemical Constr. Corp.*, 456 U. S. 461, 468. Congress has not expressed any intent to exempt federal takings claims from §1738. Third, petitioners have overstated *Williamson County*'s reach throughout this litigation. Because they were never required to ripen in state court their claim that the city ordinance was facially invalid for failure to substantially advance a legitimate state interest, see *Yee* v. *Escondido,* 503 U. S. 519, 534, they could have raised the heart of their facial takings challenges directly in federal court. With respect to those federal claims that did require ripening, petitioners are incorrect that *Williamson County* precludes state courts from hearing simultaneously a plaintiff's request for compensation under state law together with a claim that, in the alternative, the denial of compensation would violate the Fifth Amendment of the Federal Constitution. Pp. 17–23.

364 F. 3d 1088, affirmed.

STEVENS, J., delivered the opinion of the Court, in which SCALIA, SOUTER, GINSBURG, and BREYER, JJ., joined. REHNQUIST, C. J., filed an opinion concurring in the judgment, in which O'CONNOR, KENNEDY, and THOMAS, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 04–340

_____

## SAN REMO HOTEL, L. P., ET AL., PETITIONERS *v.* CITY AND COUNTY OF SAN FRANCISCO, CALIFORNIA, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 20, 2005]

JUSTICE STEVENS delivered the opinion of the Court.

This case presents the question whether federal courts may craft an exception to the full faith and credit statute, 28 U. S. C. §1738, for claims brought under the Takings Clause of the Fifth Amendment.

Petitioners, who own and operate a hotel in San Francisco, California (hereinafter City), initiated this litigation in response to the application of a city ordinance that required them to pay a $567,000 "conversion fee" in 1996. After the California courts rejected petitioners' various state-law takings claims, they advanced in the Federal District Court a series of federal takings claims that depended on issues identical to those that had previously been resolved in the state-court action. In order to avoid the bar of issue preclusion, petitioners asked the District Court to exempt from §1738's reach claims brought under the Takings Clause of the Fifth Amendment.

Petitioners' argument is predicated on *Williamson County Regional Planning Comm'n* v. *Hamilton Bank of Johnson City*, 473 U. S. 172 (1985), which held that tak-

ings claims are not ripe until a State fails "to provide adequate compensation for the taking." *Id.*, at 195. Unless courts disregard §1738 in takings cases, petitioners argue, plaintiffs will be forced to litigate their claims in state court without any realistic possibility of ever obtaining review in a federal forum. The Ninth Circuit's rejection of this argument conflicted with the Second Circuit's decision in *Santini* v. *Connecticut Hazardous Waste Management Service*, 342 F. 3d 118 (2003). We granted certiorari to resolve the conflict, 543 U. S. ___ (2004),[1] and now affirm the judgment of the Ninth Circuit.

I

The San Remo Hotel is a three-story, 62-unit hotel in the Fisherman's Wharf neighborhood in San Francisco. In December 1906, shortly after the great earthquake and fire destroyed most of the city, the hotel—then called the "New California Hotel"—opened its doors to house dislocated individuals, immigrants, artists, and laborers. The City officially licensed the facility to operate as a hotel and restaurant in 1916, and in 1922 the hotel was given its current name. When the hotel fell into financial difficulties and a "dilapidated condition" in the early 1970's, Robert and Thomas Field purchased the facility, restored it, and began to operate it as a bed and breakfast inn. See *San Remo Hotel, L. P.* v. *City and County of San Francisco*, 100 Cal. Rptr. 2d 1, 5 (Cal. App. 2000) (officially

---

[1] Although petitioners asked this Court to review two separate questions, our grant of certiorari was limited exclusively to the question whether "a Fifth Amendment Takings claim [is] barred by issue preclusion based on a judgment denying compensation solely under state law, which was rendered in a state court proceeding that was required to ripen the federal Takings claim?" Pet. for Cert. i. Thus, we have no occasion to reach petitioners' claim that, under California law, the substantive state takings law decision of the California Supreme Court was not entitled to preclusive effect in federal court. See Brief for Petitioners 19–21.

depublished).

In 1979, San Francisco's Board of Supervisors responded to "a severe shortage" of affordable rental housing for elderly, disabled, and low-income persons by instituting a moratorium on the conversion of residential hotel units into tourist units. San Francisco Residential Hotel Unit Conversion and Demolition Ordinance (hereinafter Hotel Conversion Ordinance or HCO) §§41.3(a)–(g), Pet. for Cert. 195a–197a. Two years later, the City enacted the first version of the Hotel Conversion Ordinance to regulate all future conversions. San Francisco Ordinance No. 330–81, codified in §41.1 *et seq.* Under the 1981 version of the HCO, a hotel owner could convert residential units into tourist units only by obtaining a conversion permit. And those permits could be obtained only by constructing new residential units, rehabilitating old ones, or paying an "in lieu" fee into the City's Residential Hotel Preservation Fund Account. See §§41.12–41.13, Pet. for Cert. 224a–231a. The City substantially strengthened the HCO in 1990 by eliminating several exceptions that had existed in the 1981 version and increasing the size of the "in lieu" fee hotel owners must pay when converting residential units. See 145 F. 3d 1095, 1099 (CA9 1998).

The genesis of this protracted dispute lies in the 1981 HCO's requirement that each hotel "file an initial unit usage report containing" the "number of residential and tourist units in the hotel[s] as of September 23, 1979." §41.6(b)(1), Pet. for Cert. 206a. Jean Iribarren was operating the San Remo Hotel, pursuant to a lease from petitioners, when this requirement came into effect. Iribarren filed the initial usage report for the hotel, which erroneously reported that all of the rooms in the hotel were "residential" units.[2] The consequence of that initial classi-

_____

[2] It seems that despite this initial classification, the San Remo Hotel has operated as a mixed hotel for tourists and long-term residents since

fication was that the City zoned the San Remo Hotel as "residential hotel"—in other words, a hotel that consisted entirely of residential units. And that zoning determination ultimately meant that, despite the fact that the San Remo Hotel had operated in practice as a tourist hotel for many years, 145 F. 3d, at 1100, petitioners were required to apply for a conditional use permit to do business officially as a "tourist hotel," 27 Cal. 4th 643, 654, 41 P. 3d 87, 94 (2002).

After the HCO was revised in 1990, petitioners applied to convert all of the rooms in the San Remo Hotel into tourist use rooms under the relevant HCO provisions and requested a conditional use permit under the applicable zoning laws. In 1993, the City Planning Commission granted petitioners' requested conversion and conditional use permit, but only after imposing several conditions, one of which included the requirement that petitioners pay a $567,000 "in lieu" fee.[3] Petitioners appealed, arguing that the HCO requirement was unconstitutional and otherwise improperly applied to their hotel. See *id.,* at 656, 41 P. 3d, at 95. The City Board of Supervisors rejected petitioners' appeal on April 19, 1993.

In March 1993, Petitioners filed for a writ of administrative mandamus in California Superior Court. That action lay dormant for several years, and the parties

───────────

long before the HCO was enacted. According to the California Supreme Court, in "a 1992 declaration by [petitioners], Iribarren filed the 'incorrect' initial unit usage report without their knowledge. They first discovered the report in 1983 when they resumed operation of the hotel. They protested the residential use classification in 1987, but were told it could not be changed because the appeal period had passed." 27 Cal. 4th 643, 654, 41 P. 3d 87, 94 (2002).

[3] The application specifically required petitioners (1) to pay for 40 percent of the cost of replacement housing for the 62 lost residential units; (2) to offer lifetime leases to any then-current residential users; and (3) to "obtain variances from floor-area ratio and parking requirements." *Id.,* at 656, 41 P. 3d, at 95.

ultimately agreed to stay that action after petitioners filed for relief in Federal District Court.

Petitioners filed in federal court for the first time on May 4, 1993. Petitioners' first amended complaint alleged four counts of due process (substantive and procedural) and takings (facial and as-applied)[4] violations under the Fifth and Fourteenth Amendments to the United States Constitution, one count seeking damages under Rev. Stat. §1979, 42 U. S. C. §1983, for those violations, and one pendent state-law claim. The District Court granted respondents summary judgment. As relevant to this action, the court found that petitioners' facial takings claim was untimely under the applicable statute of limitations, and that the as-applied takings claim was unripe under *Williamson County,* 473 U. S. 172.

On appeal to the Court of Appeals for the Ninth Circuit, petitioners took the unusual position that the court should not decide their federal claims, but instead should abstain under *Railroad Comm'n of Tex.* v. *Pullman Co.*, 312 U. S. 496 (1941), because a return to state court could conceivably moot the remaining federal questions. See App. 67–68; see also 145 F. 3d, at 1101. The Court of Appeals obliged petitioners' request with respect to the facial challenge, a request that respondents apparently viewed as an "outrageous act of chutzpah." *Id.,* at 1105. That claim, the court reasoned, was "ripe the instant the 1990 HCO was enacted," *id.*, at 1102, and appropriate for *Pullman* absten-

—————

[4] Specifically, count 3 alleged that the HCO was facially unconstitutional under the Takings Clause because it "fails to substantially advance legitimate government interests, deprives plaintiffs of the opportunity to earn a fair return on its investment, denies plaintiffs economically viable use of their property, and forces plaintiffs to bear the public burden of housing the poor, all without just compensation." First Amended and Supplemental Complaint, No. C–93–1644–DLJ (D. Cal., Jan. 24, 1994), p. 20, ¶49. Count 4, which advanced petitioners' as-applied Takings Clause violation, was predicated on the same rationale. *Id.,* at 21.

tion principally because petitioners' "entire case" hinged on the propriety of the planning commission's zoning designation—the precise subject of the pending state mandamus action, 145 F. 3d, at 1105.[5] The court, however, affirmed the District Court's determination that petitioners' as-applied takings claim—the claim that the application of the HCO to the San Remo Hotel violated the Takings Clause—was unripe. Because petitioners had failed to pursue an inverse condemnation action in state court, they had not yet been denied just compensation as contemplated by *Williamson County*. 145 F. 3d, at 1105.

At the conclusion of the Ninth Circuit's opinion, the court appended a footnote stating that petitioners would be free to raise their federal takings claims in the California courts. If, however, they wanted to "retain [their] right to return to federal court for adjudication of [their] federal claim, [they] must make an appropriate reservation in state court." *Id.*, at 1106, n. 7 (citations omitted).[6] That is precisely what petitioners attempted to do when they reactivated the dormant California case. Yet petitioners advanced more than just the claims on which the federal court had abstained, and phrased their state claims in language that sounded in the rules and standards established and refined by this Court's takings jurisprudence. Petitioners claimed, for instance, that "imposition of the fee 'fails to substantially advance a legitimate government interest' and that '[t]he amount of the fee imposed is not roughly proportional to the impact' of the proposed tourist use of the San Remo Hotel." 27

---

[5] The Court of Appeals did not answer the question whether this claim was barred by the statute of limitations, as the District Court had held.

[6] The reservation discussed in the Ninth Circuit's opinion was the common reservation of federal claims made in state litigation under *England* v. *Louisiana Bd. of Medical Examiners*, 375 U. S. 411, 420–421 (1964).

Cal. 4th, at 656, 41 P. 3d, at 95 (quoting petitioners' second amended state complaint).[7] The state trial court dismissed petitioners' amended complaint, but the intermediate appellate court reversed. The court held that petitioners' claim that the payment of the "in lieu" fee effected a taking should have been evaluated under heightened scrutiny. Under more exacting scrutiny, the fee failed this Court's "essential nexus" and "rough proportionality" tests because, *inter alia*, it was based on the original flawed designation that the San Remo Hotel was an entirely "residential use" facility. See *id.,* at 657–658, 41 P. 3d, at 96–97 (summarizing appellate court opinion).

The California Supreme Court reversed over the partial dissent of three justices.[8] The court initially noted that petitioners had reserved their federal causes of action and had sought no relief for any violation of the Federal Constitution. *Id.,* at 649, n. 1, 41 P. 3d, at 91, n. 1.[9] In the portion of its opinion discussing the Takings Clause of the California Constitution, however, the court noted that "we appear to have construed the clauses congruently." *Id.,* at 664, 41 P. 3d, at 100–101 (citing cases). Accordingly, despite the fact that petitioners sought relief only under

---

[7] With respect to claims that a regulation fails to advance a legitimate state interest, see generally *Lingle* v. *Chevron U. S. A. Inc.,* 544 U. S. \_\_\_, (2005) (slip op., at 6–15). With respect to "rough proportionality" claims, see generally *Nollan* v. *California Coastal Comm'n*, 483 U. S. 825 (1987); *Dolan* v. *City of Tigard*, 512 U. S. 374 (1994).

[8] Justice Baxter and Justice Chin opined that because some hotel rooms had been previously rented to tourists, the "in lieu" payment was excessive. 27 Cal. 4th, at 691, 41 P. 3d, at 119–120. Justice Brown opined that a 1985 statute had effectively superseded the HCO and disagreed with the majority's analysis of the constitutional issues. *Id*., at 699, 700–704, 41 P. 3d, at 125–128.

[9] "Plaintiffs sought no relief in state court for violation of the Fifth Amendment to the United States Constitution. They explicitly reserved their federal causes of action. As their petition for writ of mandate, as well, rests solely on state law, no federal question has been presented or decided in this case." *Ibid.*

California law, the state court decided to "analyze their takings claim under the relevant decisions of both this court and the United States Supreme Court." *Ibid.*, 41 P. 3d, at 101.[10]

The principal constitutional issue debated by the parties was whether a heightened level of scrutiny applied to the claim that the housing replacement fee "'does not substantially advance legitimate state interests.'" *Ibid.* (quoting *Lucas* v. *South Carolina Coastal Council*, 505 U. S. 1003, 1016 (1992)). In resolving that debate the court focused on our opinions in *Nollan* v. *California Coastal Comm'n*, 483 U. S. 825 (1987), and *Dolan* v. *City of Tigard*, 512 U. S. 374 (1994). Rejecting petitioners' argument that heightened scrutiny should apply, the court emphasized the distinction between discretionary exactions imposed by executive officials on an ad hoc basis and "'generally applicable zoning regulations'" involving "'legislative determinations.'" 27 Cal. 4th, at 666–668, 41 P. 3d, at 102–104 (quoting, *e.g.*, *Dolan*, 512 U. S., at 385, 391, n. 8). The court situated the HCO within the latter category, reasoning that the ordinance relied upon fixed fees computed under a formula that is generally applicable to broad classes of property owners.[11] The court concluded that the

_____

[10] See also *id.*, at 665, 41 P. 3d, at 101 ("[I]t is the last mentioned prong of the *high court's takings analysis* that is at issue here" (emphasis added)).

[11] See *id.,* at 669, 41 P. 3d, at 104 (noting that the "HCO is generally applicable legislation in that it applies, without discretion or discrimination, to every residential hotel in the city" and that "no meaningful government discretion enters into either the imposition or the calculation of the in lieu fee"). The court noted that the general class of property owners included more than 500 properties containing over 18,000 rooms, *id.,* at 669, n. 12, 41 P. 3d, at 104, n. 12, and concluded that the HCO "applies to all property in the class logically subject to its strictures, that is, to all residential hotel units; no more can rationally be demanded of local land use legislation in order to qualify for deferential review," *id.*, at 669, 41 P. 3d, at 104.

less demanding "reasonable relationship" test should apply to the HCO's monetary assessments, 27 Cal. 4th, at 671, 41 P. 3d, at 105.

Applying the "reasonable relationship" test, the court upheld the HCO on its face and as-applied to petitioners. As to the facial challenge, the court concluded that the HCO's mandated conversion fees "bear a reasonable relationship to the loss of housing . . . in the *generality* or *great majority* of cases. . . ." *Id.*, at 673, 41 P. 3d, at 107. With respect to petitioners' as-applied challenge, the court concluded that the conversion fee was reasonably based on the number of units designated for conversion, which itself was based on petitioners' own estimate that had been provided to the City in 1981 and had remained unchallenged for years. *Id.*, at 678, and n. 17, 41 P. 3d, at 110–111, and n. 17. The court therefore reversed the appellate court and reinstated the trial court's order dismissing petitioners' complaint.

Petitioners did not seek a writ of certiorari from the California Supreme Court's decision in this Court. Instead, they returned to Federal District Court by filing an amended complaint based on the complaint that they had filed prior to invoking *Pullman* abstention.[12] The District

———————

[12] The third amended complaint, which was filed on November 14, 2002, alleged two separate counts. See App. 88–93. Count 1 alleged that the HCO was facially unconstitutional and unconstitutional as-applied to petitioners because (a) it failed "to substantially advance legitimate government interests"; (b) it forced petitioners "to bear the public burden of housing the poor"; and (c) it imposed unreasonable conditions on petitioners' request for a conditional use permit (the in lieu fee and the required lifetime leases to residential tenants). *Id.,* at 88–89. Count 2 sought relief under 42 U. S. C. §1983 based on (a) extortion through the imposition of the $567,000 fee; (b) an actual taking of property under *Penn Central Transp. Co.* v. *New York City*, 438 U. S. 104 (1978); (c) the failure of the HCO as applied to petitioners to advance legitimate state interests; (d) the City's requirement that petitioners bear the full cost of providing a general public benefit

Court held that petitioners' facial attack on the HCO was not only barred by the statute of limitations, but also by the general rule of issue preclusion. See Pet. for Cert. 85a–86a.[13]  The District Court reasoned that 28 U. S. C. §1738 requires federal courts to give preclusive effect to any state-court judgment that would have preclusive effect under the laws of the State in which the judgment was rendered. Because California courts had interpreted the relevant substantive state takings law coextensively with federal law, petitioners' federal claims constituted the same claims that had already been resolved in state court.

The Court of Appeals affirmed. The court rejected petitioners' contention that general preclusion principles should be cast aside whenever plaintiffs "must litigate in state court pursuant to *Pullman* and/or *Williamson County*." 364 F. 3d 1088, 1096 (CA9 2004). Relying on unambiguous Circuit precedent and the absence of any clearly contradictory decisions from this Court, the Court of Appeals found itself bound to apply general issue preclusion doctrine. Given that general issue preclusion principles governed, the only remaining question was whether the District Court properly applied that doctrine; the court concluded that it did. The court expressly rejected petitioners' contention "that California takings law is not coextensive with federal takings law," *id.,* at 1096, and held that the state court's application of the "reasonable relationship" test was an "'equivalent determination' of such claims under the federal takings clause," *id.*, at 1098.[14] We granted certiorari and now affirm.

_____

(public housing) without just compensation.

[13] The District Court found that most of petitioners' as-applied claims amounted to nothing more than improperly labeled facial challenges. See Pet. for Cert. 82a–85a. The remainder of petitioners' as-applied claims, the court held, was barred by the statute of limitations. *Id.*, at 84a–85a.

[14] California courts apply issue preclusion to a final judgment in ear-

## II

Article IV, §1, of the United States Constitution demands that "Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State. And the Congress may by general Laws prescribe the Manner in which such Acts, Records and Proceedings shall be proved, and the Effect thereof." In 1790, Congress responded to the Constitution's invitation by enacting the first version of the full faith and credit statute. See Act of May 26, 1790, ch. 11, 1 Stat. 122.[15] The modern version of the statute, 28 U. S. C. §1738, provides that "judicial proceedings . . . shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State . . . ." This statute has long been understood to encompass the doctrines of res judicata, or "claim preclusion," and collateral estoppel, or "issue preclusion." See *Allen* v. *McCurry*, 449 U. S. 90, 94–96 (1980).[16]

––––––––––

lier litigation between the same parties if "(1) the issue decided in the prior case is identical with the one now presented; (2) there was a final judgment on the merits in the prior case, and (3) the party to be estopped was a party to the prior adjudication." 364 F. 3d 1088, 1096 (CA9 2004). The court reasoned that the California Supreme Court's decision satisfied those criteria because petitioners' takings challenges "raised in state court are identical to the federal claims . . . and are based on the same factual allegations." *Ibid.* Our limited review in this case does not include the question whether the Court of Appeals' reading of California preclusion law was in error.

[15]"This statute has existed in essentially unchanged form since its enactment just after the ratification of the Constitution . . . ." *Allen* v. *McCurry*, 449 U. S. 90, 96, n. 8 (1980).

[16]"Under res judicata, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action. Under collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." *Id.*, at 94

The general rule implemented by the full faith and credit statute—that parties should not be permitted to relitigate issues that have been resolved by courts of competent jurisdiction—predates the Republic.[17]  It "has found its way into every system of jurisprudence, not only from its obvious fitness and propriety, but because without it, an end could never be put to litigation."  *Hopkins* v. *Lee*, 6 Wheat. 109, 114 (1821).  This Court has explained that the rule

> "is demanded by the very object for which civil courts have been established, which is to secure the peace and repose of society by the settlement of matters capable of judicial determination.  Its enforcement is essential to the maintenance of social order; for, the aid of judicial tribunals would not be invoked for the vindication of rights of person and property, if, as between parties and their privies, conclusiveness did not attend the judgments of such tribunals in respect of all matters properly put in issue and actually determined by them."  *Southern Pacific R. Co.* v. *United States*, 168 U. S. 1, 49 (1897).

As this case is presented to us, under our limited grant of certiorari, we have only one narrow question to decide: whether we should create an exception to the full faith and credit statute, and the ancient rule on which it is based, in order to provide a federal forum for litigants who seek to advance federal takings claims that are not ripe

————————

(citations omitted).

[17] "The authority of the *res judicata*, with the limitations under which it is admitted, is derived by us from the Roman law and the Canonists." *Washington, Alexandria, & Georgetown Steam-Packet Co.* v. *Sickles*, 24 How. 333, 341 (1861); see also *id.*, at 343 (noting that the rule also has its pedigree "[i]n the courts upon the continent of Europe, and in the courts of chancery and admiralty in the United States and Great Britain, where the function of adjudication is performed entire by a tribunal composed of one or more judges . . .").

until the entry of a final state judgment denying just compensation. See *Williamson County,* 473 U. S. 172.[18]

The essence of petitioners' argument is as follows: because no claim that a state agency has violated the federal Takings Clause can be heard in federal court until the property owner has "been denied just compensation" through an available state compensation procedure, *id.,* at 195, "federal courts [should be] required to disregard the decision of the state court" in order to ensure that federal takings claims can be "considered on the merits in . . . federal court." See Brief for Petitioners 8, 14. Therefore, the argument goes, whenever plaintiffs reserve their claims under *England* v. *Louisiana Bd. of Medical Examiners*, 375 U. S. 411 (1964), federal courts should review the reserved federal claims *de novo*, regardless of what issues the state court may have decided or how it may have decided them.

We reject petitioners' contention. Although petitioners were certainly entitled to reserve some of their federal claims, as we shall explain, *England* does not support their erroneous expectation that their reservation would fully negate the preclusive effect of the state-court judgment with respect to any and all federal issues that might arise in the future federal litigation. Federal courts, moreover, are not free to disregard 28 U. S. C. §1738 simply to guarantee that all takings plaintiffs can have their day in federal court. We turn first to *England*.

————————

[18] We did not grant certiorari on many of the issues discussed by the parties and *amici*. We therefore assume for purposes of our decision that all other issues in this protracted controversy have been correctly decided. We assume, for instance, that the Ninth Circuit properly interpreted California preclusion law; that the California Supreme Court was correct in its determination that California takings law is coextensive with federal law; that, as a matter of California law, the HCO was lawfully applied to petitioners' hotel; and that under California law, the "in lieu" fee was imposed evenhandedly and substantially advanced legitimate state interests.

### III

*England* involved a group of plaintiffs who had graduated from chiropractic school, but sought to practice in Louisiana without complying with the educational requirements of the State's Medical Practice Act. 375 U. S., at 412. They filed suit in federal court challenging the constitutionality of the Act. The District Court invoked *Pullman* abstention and stayed the proceedings to enable the Louisiana courts to decide a preliminary and essential question of state law—namely, whether the state statute applied at all to chiropractors. 375 U. S., at 413.[19] The state court, however, reached beyond the state-law question and held not only that the statute applied to the plaintiffs but also that its application was consistent with the Fourteenth Amendment to the Federal Constitution. The Federal District Court then dismissed the federal action without addressing the merits of the federal claim.

On appeal, we held that when a federal court abstains from deciding a federal constitutional issue to enable the state courts to address an antecedent state-law issue, the plaintiff may reserve his right to return to federal court for the disposition of his federal claims. *Id.,* at 419. In that case, the antecedent state issue requiring abstention was *distinct* from the reserved federal issue. See *id.*, at 418–419. Our discussion of the "typical case" in which reservations of federal issues are appropriate makes clear that our holding was limited to cases that are fundamentally distinct from petitioners'. "Typical" *England* cases generally involve federal constitutional challenges to a state statute that can be avoided if a state court construes

_____

[19] We stressed in *England* that abstention was essential to prevent the district court from deciding "'questions of constitutionality on the basis of preliminary guesses regarding local law.'" 375 U. S., at 416, n. 7 (quoting *Spector Motor Service, Inc.* v. *McLaughlin*, 323 U. S. 101, 105 (1944)).

the statute in a particular manner.[20]　In such cases, the purpose of abstention is not to afford state courts an opportunity to adjudicate an issue that is functionally identical to the federal question.　To the contrary, the purpose of *Pullman* abstention in such cases is to avoid resolving the federal question by encouraging a state-law determination that may moot the federal controversy.　See 375 U. S., at 416–417, and n. 7.[21]　Additionally, our opinion made it perfectly clear that the effective reservation of a federal claim was dependent on the condition that plaintiffs take no action to broaden the scope of the state court's review beyond decision of the antecedent state-law issue.[22]

　Our holding in *England* does not support petitioners' attempt to relitigate issues resolved by the California courts.　With respect to petitioners' facial takings claims, the Court of Appeals invoked *Pullman* abstention after determining that a ripe federal question existed—namely, "the facial takings challenge to the 1990 HCO."　145 F. 3d, at 1105.[23]　It did so because "'land use planning is a sensi-

_____

[20] 375 U. S., at 420 (describing the "typical case" as one in which "the state courts are asked to construe a state statute against the backdrop of a federal constitutional challenge").

[21] As we explained in *Allen,* 449 U. S., at 101–102, n. 17, "[t]he holding in *England* depended entirely on this Court's view of the purpose of abstention in such a case: Where a plaintiff *properly invokes* federal-court jurisdiction in the first instance on a federal claim, the federal court has a duty to accept that jurisdiction.　Abstention may serve only to postpone, rather than to abdicate, jurisdiction, since its purpose is to determine whether resolution of the federal question is even necessary, or to obviate the risk of a federal court's erroneous construction of state law." (Emphasis added and citations omitted.)

[22] 375 U. S., at 419 ("[I]f a party freely and without reservation submits his federal claims for decision by the state courts, litigates them there, and has them decided there, then . . . he has elected to forgo his right to return to the District Court").

[23] Petitioners' facial challenges to the HCO were ripe, of course, under *Yee* v. *Escondido*, 503 U. S. 519, 534 (1992), in which we held that facial challenges based on the "substantially advances" test need not be ripened

tive area of social policy'" and because petitioners' pending state mandamus action had the potential of mooting their facial challenge to the HCO by overturning the City's original classification of the San Remo Hotel as a "residential" property. *Ibid.* Thus, petitioners were entitled to insulate from preclusive effect one federal issue—their facial constitutional challenge to the HCO—while they returned to state court to resolve their petition for writ of mandate.

Petitioners, however, chose to advance broader issues than the limited issues contained within their state petition for writ of administrative mandamus on which the Ninth Circuit relied when it invoked *Pullman* abstention. In their state action, petitioners advanced not only their request for a writ of administrative mandate, 27 Cal. 4th, at 653, 41 P. 3d, at 93, but also their various claims that the HCO was unconstitutional on its face and as applied for (1) its failure to substantially advance a legitimate interest, (2) its lack of a nexus between the required fees and the ultimate objectives sought to be achieved via the ordinance, and (3) its imposition of an undue economic burden on individual property owners. *Id.*, at 672–676, 41 P. 3d, at 106–109. By broadening their state action beyond the mandamus petition to include their "substantially advances" claims, petitioners effectively asked the state court to resolve the same federal issues they asked it to reserve. *England* does not support the exercise of any such right.

Petitioners' as-applied takings claims fare no better. As an initial matter, the Court of Appeals did not abstain with respect to those claims. Instead, the court found that they were unripe under *Williamson County*. The court

---

in state court—the claims do "not depend on the extent to which petitioners are deprived of the economic use of their particular pieces of property or the extent to which these particular petitioners are compensated." *Ibid.*

therefore affirmed the district court's dismissal of those claims. 145 F. 3d, at 1106. Unlike their "substantially advances" claims, petitioners' as-applied claims were never properly before the District Court, and there was no reason to expect that they could be relitigated in full if advanced in the state proceedings. See *Allen*, 449 U. S., at 101, n. 17. In short, our opinion in *England* does not support petitioners' attempt to circumvent §1738.

## IV

Petitioners' ultimate submission, however, does not rely on *England* alone. Rather, they argue that federal courts simply should not apply ordinary preclusion rules to state-court judgments when a case is forced into state court by the ripeness rule of *Williamson County*. For support, petitioners rely on the Court of Appeals for the Second Circuit's decision in *Santini*, 342 F. 3d, at 130.

In *Santini*, the Second Circuit held that parties "who litigate state-law takings claims in state court involuntarily" pursuant to *Williamson County* cannot be precluded from having those very claims resolved "by a federal court." 342 F. 3d, at 130. The court did not rest its decision on any provision of the federal full faith and credit statute or our cases construing that law. Instead, the court reasoned that "[i]t would be both ironic and unfair if the very procedure that the Supreme Court required [plaintiffs] to follow before bringing a Fifth Amendment takings claim . . . also precluded [them] from ever bringing a Fifth Amendment takings claim." *Ibid.* We find this reasoning unpersuasive for several reasons.

First, both petitioners and *Santini* ultimately depend on an assumption that plaintiffs have a right to vindicate their federal claims in a federal forum. We have repeatedly held, to the contrary, that issues actually decided in valid state-court judgments may well deprive plaintiffs of the "right" to have their federal claims relitigated in fed-

eral court. See, *e.g., Migra* v. *Warren City School Dist. Bd. of Ed.*, 465 U. S. 75, 84 (1984); *Allen*, 449 U. S., at 103–104. This is so even when the plaintiff would have preferred not to litigate in state court, but was required to do so by statute or prudential rules. See *id.,* at 104. The relevant question in such cases is not whether the plaintiff has been afforded access to a federal forum; rather, the question is whether the state court actually decided an issue of fact or law that was necessary to its judgment.

In *Allen*, the plaintiff, Willie McCurry, invoked the Fourth and Fourteenth Amendments in an unsuccessful attempt to suppress evidence in a state criminal trial. After he was convicted, he sought to remedy his alleged constitutional violation by bringing a suit for damages under 42 U. S. C. §1983 against the officers who had entered his home. Relying on "'the special role of federal courts in protecting civil rights'" and the fact that §1983 provided the "only route to a federal forum," the court of appeals held that McCurry was entitled to a federal trial unencumbered by collateral estoppel. 449 U. S., at 93. We rejected that argument emphatically.

> "The actual basis of the Court of Appeals' holding appears to be a generally framed principle that every person asserting a federal right is entitled to one unencumbered opportunity to litigate that right in a federal district court, regardless of the legal posture in which the federal claim arises. But the authority for this principle is difficult to discern. It cannot lie in the Constitution, which makes no such guarantee, but leaves the scope of the jurisdiction of the federal district courts to the wisdom of Congress. And no such authority is to be found in §1983 itself . . . . There is, in short, no reason to believe that Congress intended to provide a person claiming a federal right an unrestricted opportunity to relitigate an issue already de-

cided in state court simply because the issue arose in a state proceeding in which he would rather not have been engaged at all." *Id.,* at 103–104.[24]

As in *Allen*, we are presently concerned only with issues *actually decided* by the state court that are dispositive of federal claims raised under §1983. And, also as in *Allen,* it is clear that petitioners would have preferred not to have been forced to have their federal claims resolved by issues decided in state court. Unfortunately for petitioners, it is entirely *unclear* why their preference for a federal forum should matter for constitutional or statutory purposes.

The only distinction between this case and *Allen* that is possibly relevant is the fact that petitioners here originally invoked the jurisdiction of a Federal District Court, which abstained on *Pullman* grounds while petitioners returned to state court. But petitioners' as-applied takings claims were never properly before the District Court because they were unripe. And, as we have already explained, the Court of Appeals invoked *Pullman* abstention only with respect to petitioners' "substantially advances" takings challenge, which petitioners then gratuitously presented to the state court. At a bare minimum, with respect to the facial takings claim, petitioners were "in an offensive posture in [their] state court proceeding, and could have proceeded first in federal court had [they] wanted to litigate [their "substantially advances"] federal claim in a federal forum." *Migra,* 465 U. S., at 85, n. 7.

---

[24] We expressed similar views in *Migra* v. *Warren City School Dist. Bd. of Ed.,* 465 U. S. 75, 84 (1984):

"Although such a division may seem attractive from a plaintiff's perspective, it is not the system established by §1738. That statute embodies the view that it is more important to give full faith and credit to state-court judgments than to ensure separate forums for federal and state claims. This reflects a variety of concerns, including notions of comity, the need to prevent vexatious litigation, and a desire to conserve judicial resources."

Thus, the only distinction between this case and *Allen* is a distinction of no relevant significance.

The second reason we find petitioners' argument unpersuasive is that it assumes that courts may simply create exceptions to 28 U. S. C. §1738 wherever courts deem them appropriate. Even conceding, *arguendo,* the laudable policy goal of making federal forums available to deserving litigants, we have expressly rejected petitioners' view. "Such a fundamental departure from traditional rules of preclusion, enacted into federal law, can be justified only if plainly stated by Congress." *Kremer* v. *Chemical Constr. Corp.*, 456 U. S. 461, 485 (1982). Our cases have therefore made plain that "an exception to §1738 will not be recognized unless a later statute contains an express or implied partial repeal." *Id.*, at 468 (citing *Allen*, 449 U. S., at 99). Even when the plaintiff's resort to state court is involuntary and the federal interest in denying finality is robust, we have held that Congress "must 'clearly manifest' its intent to depart from §1738." 456 U. S., at 477.

The same concerns animate our decision here. Congress has not expressed any intent to exempt from the full faith and credit statute federal takings claims. Consequently, we apply our normal assumption that the weighty interests in finality and comity trump the interest in giving losing litigants access to an additional appellate tribunal. As we explained in *Federated Department Stores, Inc.* v. *Moitie*, 452 U. S. 394, 401 (1981),

> "we do not see the grave injustice which would be done by the application of accepted principles of res judicata. 'Simple justice' is achieved when a complex body of law developed over a period of years is evenhandedly applied. The doctrine of res judicata serves vital public interests beyond any individual judge's ad hoc determination of the equities in a particular

case. There is simply 'no principle of law or equity which sanctions the rejection by a federal court of the salutary principle of *res judicata*'" (quoting *Heiser* v. *Woodruff*, 327 U. S. 726, 733 (1946)).

Third, petitioners have overstated the reach of *Williamson County* throughout this litigation. Petitioners were never required to ripen the heart of their complaint—the claim that the HCO was facially invalid because it failed to substantially advance a legitimate state interest—in state court. See *Yee* v. *Escondido,* 503 U. S. 519, 534 (1992). Petitioners therefore could have raised most of their facial takings challenges, which by their nature requested relief distinct from the provision of "just compensation," directly in federal court.[25] Alternatively, petitioners had the option of reserving their facial claims while pursuing their as-applied claims along with their petition for writ of administrative mandamus. Petitioners did not have the right, however, to seek state review of the same substantive issues they sought to reserve. The purpose of the *England* reservation is not to grant plaintiffs a second bite at the apple in their forum of choice.

With respect to those federal claims that did require ripening, we reject petitioners' contention that *Williamson County* forbids plaintiffs from advancing their federal claims in state courts. The requirement that aggrieved property owners must seek "compensation through the procedures the State has provided for doing so," 473 U. S., at 194, does not preclude state courts from hearing simultaneously a plaintiff's request for compensation under state law and the claim that, in the alternative, the denial of compensation would violate the Fifth Amendment of the

––––––––––

[25] In all events, petitioners may no longer advance such claims given our recent holding that the "'substantially advances' formula is not a valid takings test, and indeed . . . has no proper place in our takings jurisprudence." *Lingle,* 544 U. S., at ___ (slip op., at 18).

Federal Constitution.   Reading *Williamson County* to preclude plaintiffs from raising such claims in the alternative would erroneously interpret our cases as requiring property owners to "resort to piecemeal litigation or otherwise unfair procedures."   *MacDonald, Sommer & Frates* v. *Yolo County*, 477 U. S. 340, 350, n. 7 (1986).

It is hardly a radical notion to recognize that, as a practical matter, a significant number of plaintiffs will necessarily litigate their federal takings claims in state courts. It was settled well before *Williamson County* that "a claim that the application of government regulations effects a taking of a property interest is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue."   473 U. S., at 186.   As a consequence, there is scant precedent for the litigation in federal district court of claims that a state agency has taken property in violation of the Fifth Amendment's takings clause.   To the contrary, most of the cases in our takings jurisprudence, including nearly all of the cases on which petitioners rely, came to us on writs of certiorari from state courts of last resort.[26]

Moreover, this is not the only area of law in which we have recognized limits to plaintiffs' ability to press their federal claims in federal courts.   See, *e.g., Fair Assessment in Real Estate Assn., Inc.* v. *McNary*, 454 U. S. 100, 116 (1981) (holding that taxpayers are "barred by the principle of comity from asserting §1983 actions against the validity

_____

[26] See, *e.g., Dolan*, 512 U. S., at 383; *Yee,* 503 U. S., at 526; *Nollan*, 483 U. S., at 830; *First English Evangelical Lutheran Church of Glendale* v. *County of Los Angeles*, 482 U. S. 304, 310–311 (1987); *Penn Central*, 438 U. S., at 120–122.   Indeed, Justice Holmes' famous "too far" formulation, which spawned our regulatory takings jurisprudence, was announced in a case that came to this Court via a writ of certiorari to Pennsylvania's highest court.   *Pennsylvania Coal Co.* v. *Mahon,* 260 U. S. 393, 415 (1922).

of state tax systems in federal courts"). State courts are fully competent to adjudicate constitutional challenges to local land-use decisions. Indeed, state courts undoubtedly have more experience than federal courts do in resolving the complex factual, technical, and legal questions related to zoning and land-use regulations.

At base, petitioners' claim amounts to little more than the concern that it is unfair to give preclusive effect to state-court proceedings that are not chosen, but are instead *required* in order to ripen federal takings claims. Whatever the merits of that concern may be, we are not free to disregard the full faith and credit statute solely to preserve the availability of a federal forum. The Court of Appeals was correct to decline petitioners' invitation to ignore the requirements of 28 U. S. C. §1738. The judgment of the Court of Appeals is therefore affirmed.

*It is so ordered*

# SUPREME COURT OF THE UNITED STATES

_____

No. 04–340

_____

## SAN REMO HOTEL, L. P., ET AL., PETITIONERS *v.* CITY AND COUNTY OF SAN FRANCISCO, CALIFORNIA, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 20, 2005]

CHIEF JUSTICE REHNQUIST, with whom JUSTICE O'CONNOR, JUSTICE KENNEDY, and JUSTICE THOMAS join, concurring in the judgment.

I agree that the judgment of the Court of Appeals should be affirmed. Whatever the reasons for petitioners' chosen course of litigation in the state courts, it is quite clear that they are now precluded by the full faith and credit statute, 28 U. S. C. §1738, from relitigating in their 42 U. S. C. §1983 action those issues which were adjudicated by the California courts. See *Migra* v. *Warren City School Dist. Bd. of Ed.,* 465 U. S. 75, 84 (1984); *Allen* v. *McCurry,* 449 U. S. 90, 103–105 (1980). There is no basis for us to except from §1738's reach all claims brought under the Takings Clause. See, *e.g.*, *Kremer* v. *Chemical Constr. Corp.,* 456 U. S. 461, 485 (1982). I write separately to explain why I think part of our decision in *Williamson County Regional Planning Comm'n* v. *Hamilton Bank of Johnson City,* 473 U. S. 172 (1985), may have been mistaken.

In *Williamson County*, the respondent land developer filed a §1983 suit in federal court alleging a regulatory takings claim after a regional planning commission disapproved respondent's plat proposals, but before respondent appealed that decision to the zoning board of appeals. *Id.,* at 181–182. Rather than reaching the merits, we found

the claim was brought prematurely. *Id.*, at 200. We first held that the claim was "not ripe until the government entity charged with implementing the regulations [had] reached a final decision regarding the application of the regulations to the property at issue." *Id.*, at 186. Because respondent failed to seek variances from the planning commission or the zoning board of appeals, we decided that respondent had failed to meet the final-decision requirement. *Id.*, at 187–191. We then noted a "second reason the taking claim [was] not yet ripe": "respondent did not seek compensation through the procedures the State [had] provided for doing so." *Id.*, at 194. Until the claimant had received a final denial of compensation through all available state procedures, such as by an inverse condemnation action, we said he could not "claim a violation of the Just Compensation Clause." *Id.*, at 195–196.

It is not clear to me that *Williamson County* was correct in demanding that, once a government entity has reached a final decision with respect to a claimant's property, the claimant must seek compensation in state court before bringing a federal takings claim in federal court. The Court in *Williamson County* purported to interpret the Fifth Amendment in divining this state-litigation requirement. See, *e.g.*, *id.*, at 194, n. 13 ("The nature of the constitutional right . . . requires that a property owner utilize procedures for obtaining compensation before bringing a §1983 action"). More recently, we have referred to it as merely a prudential requirement. *Suitum* v. *Tahoe Regional Planning Agency,* 520 U. S. 725, 733–734 (1997). It is not obvious that either constitutional or prudential principles require claimants to utilize all state compensation procedures before they can bring a federal takings claim. Cf. *Patsy* v. *Board of Regents of Fla.,* 457 U. S. 496, 516 (1982) (holding that plaintiffs suing under §1983 are not required to have exhausted state administrative

remedies).[1]

The Court today attempts to shore up the state-litigation requirement by referring to *Fair Assessment in Real Estate Assn., Inc.* v. *McNary,* 454 U. S. 100 (1981). *Ante*, at 22–23. There, we held that the principle of comity (reflected in the Tax Injunction Act, 28 U. S. C. §1341) bars taxpayers from asserting §1983 claims against the validity of state tax systems in federal courts. 454 U. S., at 116. Our decision that such suits must be brought in state court was driven by the unique and sensitive interests at stake when federal courts confront claims that States acted impermissibly in administering their own tax systems. *Id.*, at 102–103, 107–113. Those historically grounded, federalism-based concerns had led to a long-standing, "fundamental principle of comity between federal courts and state governments . . . , particularly in the area of state taxation," a principle which predated the enactment of §1983 itself. *Id.*, at 103, 107–114. We decided that those interests favored requiring that taxpayers bring challenges to the validity of state tax systems in state court, despite the strong interests favoring federal-court review of alleged constitutional violations by state officials. *Id.*, at 115–116.

The Court today makes no claim that any such long-standing principle of comity toward state courts in handling federal takings claims existed at the time *Williamson County* was decided, nor that one has since developed. The Court does remark, however, that state courts are more familiar with the issues involved in local land-use

_____

[1] In creating the state-litigation rule, the Court, in addition to relying on the Fifth Amendment's text, analogized to *Ruckelshaus* v. *Monsanto Co.,* 467 U. S. 986 (1984), and *Parratt* v. *Taylor,* 451 U. S. 527 (1981). As several of petitioners' *amici* in this case have urged, those cases provided limited support for the state-litigation requirement. See Brief for Defenders of Property Rights et al. as *Amici Curiae* 9–12; Brief for Elizabeth J. Neumont et al. as *Amici Curiae* 10–14.

and zoning regulations, and it suggests that this makes it
proper to relegate federal takings claims to state court.
*Ante*, at 23.  But it is not apparent that any such expertise
matches the type of historically grounded, federalism-
based interests we found necessary to our decision in *Fair
Assessment.*  In any event, the Court has not explained
why we should hand authority over federal takings claims
to state courts, based simply on their relative familiarity
with local land-use decisions and proceedings, while allow-
ing plaintiffs to proceed directly to federal court in cases
involving, for example, challenges to municipal land-use
regulations based on the First Amendment, see, *e.g.*,
*Renton* v. *Playtime Theatres, Inc.,* 475 U. S. 41 (1986);
*Young* v. *American Mini Theatres, Inc.,* 427 U. S. 50 (1976),
or the Equal Protection Clause, see, *e.g.*, *Cleburne* v. *Cle-
burne Living Center, Inc.,* 473 U. S. 432 (1985); *Village of
Belle Terre* v. *Boraas,* 416 U. S. 1 (1974).  In short, the
affirmative case for the state-litigation requirement has
yet to be made.

Finally, *Williamson County*'s state-litigation rule has
created some real anomalies, justifying our revisiting the
issue.  For example, our holding today ensures that liti-
gants who go to state court to seek compensation will
likely be unable later to assert their federal takings claims
in federal court.  *Ante*, at 22.  And, even if preclusion law
would not block a litigant's claim, the *Rooker-Feldman*
doctrine might, insofar as *Williamson County* can be read
to characterize the state courts' denial of compensation as
a required element of the Fifth Amendment takings claim.
See *Exxon Mobil Corp.* v. *Saudi Basic Industries Corp.*,
544 U. S. ___ (2005).  As the Court recognizes, *ante*, at 22,
*Williamson County* all but guarantees that claimants will
be unable to utilize the federal courts to enforce the Fifth
Amendment's just compensation guarantee.  The basic
principle that state courts are competent to enforce federal
rights and to adjudicate federal takings claims is sound,

see *ante*, at 23, and would apply to any number of federal claims. Cf. 28 U. S. C. §2254 (providing for limited federal habeas review of state-court adjudications of alleged violations of the Constitution). But that principle does not explain why federal takings claims in particular should be singled out to be confined to state court, in the absence of any asserted justification or congressional directive.[2]

\*    \*    \*

I joined the opinion of the Court in *Williamson County*. But further reflection and experience lead me to think that the justifications for its state-litigation requirement are suspect, while its impact on takings plaintiffs is dramatic. Here, no court below has addressed the correctness of *Williamson County*, neither party has asked us to reconsider it, and resolving the issue could not benefit petitioners. In an appropriate case, I believe the Court should reconsider whether plaintiffs asserting a Fifth Amendment takings claim based on the final decision of a state or local government entity must first seek compensation in state courts.

———————

[2] Indeed, in some States the courts themselves apply the state-litigation requirement from *Williamson County Regional Planning Comm'n* v. *Hamilton Bank of Johnson City,* 473 U. S. 172 (1985), refusing to entertain any federal takings claim until the claimant receives a final denial of compensation through all the available state procedures. See, *e.g.*, *Breneric Assoc.* v. *City of Del Mar*, 69 Cal. App. 4th 166, 188–189, 81 Cal. Rptr. 2d 324, 338–339 (1998); *Melillo* v. *City of New Haven*, 249 Conn. 138, 154, n. 28, 732 A. 2d 133, 138, n. 28 (1999). This precludes litigants from asserting their federal takings claim even in *state* court. The Court tries to avoid this anomaly by asserting that, for plaintiffs attempting to raise a federal takings claim in state court as an alternative to their state claims, *Williamson County* does not command that the state courts themselves impose the state-litigation requirement. *Ante*, at 21–22. But that is so only if *Williamson County*'s state-litigation requirement is merely a prudential rule, and not a constitutional mandate, a question that the Court today conspicuously leaves open.