(Slip Opinion) OCTOBER TERM, 2018 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## KNICK *v.* TOWNSHIP OF SCOTT, PENNSYLVANIA, ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

No. 17–647.  Argued October 3, 2018—Reargued January 16, 2019— Decided June 21, 2019

The Township of Scott, Pennsylvania, passed an ordinance requiring that "[a]ll cemeteries . . . be kept open and accessible to the general public during daylight hours." Petitioner Rose Mary Knick, whose 90-acre rural property has a small family graveyard, was notified that she was violating the ordinance. Knick sought declaratory and injunctive relief in state court on the ground that the ordinance effected a taking of her property, but she did not bring an inverse condemnation action under state law seeking compensation. The Township responded by withdrawing the violation notice and staying enforcement of the ordinance. Without an ongoing enforcement action, the court held, Knick could not demonstrate the irreparable harm necessary for equitable relief, so it declined to rule on her request. Knick then filed an action in Federal District Court under 42 U. S. C. §1983, alleging that the ordinance violated the Takings Clause of the Fifth Amendment. The District Court dismissed her claim under *Williamson County Regional Planning Comm'n* v. *Hamilton Bank of Johnson City*, 473 U. S. 172, which held that property owners must seek just compensation under state law in state court before bringing a federal takings claim under §1983. The Third Circuit affirmed.

*Held*:

 1. A government violates the Takings Clause when it takes property without compensation, and a property owner may bring a Fifth Amendment claim under §1983 at that time. Pp. 5–20.

  (a) In *Williamson County*, the Court held that, as relevant here, a property developer's federal takings claim was "premature" because

he had not sought compensation through the State's inverse condemnation procedure. 473 U. S., at 197. The unanticipated consequence of this ruling was that a takings plaintiff who complied with *Williamson County* and brought a compensation claim in state court would— on proceeding to federal court after the unsuccessful state claim— have the federal claim barred because the full faith and credit statute required the federal court to give preclusive effect to the state court's decision. *San Remo Hotel, L. P.* v. *City and County of San Francisco*, 545 U. S. 323, 347. Pp. 5–6.

   (b) This Court has long recognized that property owners may bring Fifth Amendment claims for compensation as soon as their property has been taken, regardless of any other post-taking remedies that may be available to the property owner. See *Jacobs* v. *United States*, 290 U. S. 13. The Court departed from that understanding in *Williamson County* and held that a taking gives rise not to a constitutional right to just compensation, but instead gives a right to a state law procedure that will eventually result in just compensation. Just two years after *Williamson County*, however, the Court returned to its traditional understanding of the Fifth Amendment, holding that the compensation remedy is required by the Constitution in the event of a taking. *First English Evangelical Lutheran Church of Glendale* v. *County of Los Angeles*, 482 U. S. 304. A property owner acquires a right to compensation immediately upon an uncompensated taking because the taking itself violates the Fifth Amendment. See *San Diego Gas & Elec. Co.* v. *San Diego*, 450 U. S. 621, 654 (Brennan, J., dissenting). The property owner may, therefore, bring a claim under §1983 for the deprivation of a constitutional right at that time. Pp. 6–12.

   (c) *Williamson County*'s understanding of the Takings Clause was drawn from *Ruckelshaus* v. *Monsanto Co.*, 467 U. S. 986, where the plaintiff sought to enjoin a federal statute because it effected a taking, even though the statute set up a mandatory arbitration procedure for obtaining compensation. *Id.*, at 1018. That case does not support *Williamson County*, however, because Congress—unlike the States—is free to require plaintiffs to exhaust administrative remedies before bringing constitutional claims. *Williamson County* also analogized its new state-litigation requirement to federal takings practice under the Tucker Act, but a claim for just compensation brought under the Tucker Act is not a prerequisite to a Fifth Amendment takings claim—it *is* a Fifth Amendment takings claim. *Williamson County* also looked to *Parratt* v. *Taylor*, 451 U. S. 527. But *Parratt* was not a takings case at all, and the analogy from the due process context to the takings context is strained. The poor reasoning of *Williamson County* may be partially explained by the cir-

cumstances in which the state-litigation issue reached the Court, which may not have permitted the Court to adequately test the logic of the state-litigation requirement or consider its implications. Pp. 12–16.

(d) Respondents read too broadly statements in prior opinions that the Takings Clause "does not provide or require that compensation shall be actually paid in advance of the occupancy of the land to be taken. But the owner is entitled to reasonable, certain and adequate provision for obtaining compensation" after a taking. *Cherokee Nation* v. *Southern Kansas R. Co.*, 135 U. S. 641, 659. Those statements concerned requests for injunctive relief, and the availability of subsequent compensation meant that such an equitable remedy was not available. Simply because the property owner was not entitled to injunctive relief at the time of the taking does not mean there was no violation of the Takings Clause at that time. The history of takings litigation provides valuable context. At the time of the founding, there usually was no compensation remedy available to property owners, who could obtain only retrospective damages, as well as an injunction ejecting the government from the property going forward. But in the 1870s, as state courts began to recognize implied rights of action for damages under the state equivalents of the Takings Clause, they declined to grant injunctions because property owners had an adequate remedy at law. Congress enabled property owners to obtain compensation for takings by the Federal Government when it passed the Tucker Act in 1887, and this Court subsequently joined the state courts in holding that the compensation remedy is required by the Takings Clause itself. Today, because the federal and nearly all state governments provide just compensation remedies to property owners who have suffered a taking, equitable relief is generally unavailable. As long as an adequate provision for obtaining just compensation exists, there is no basis to enjoin government action effecting a taking. Pp. 16–19.

2. The state-litigation requirement of *Williamson County* is overruled. Several factors counsel in favor of this decision. *Williamson County* was poorly reasoned and conflicts with much of the Court's takings jurisprudence. Because of its shaky foundations, the rationale for the state-litigation requirement has been repeatedly recast by this Court and the defenders of *Williamson County*. The state-litigation requirement also proved to be unworkable in practice because the *San Remo* preclusion trap prevented takings plaintiffs from ever bringing their claims in federal court, contrary to the expectations of the *Williamson County* Court. Finally, there are no reliance interests on the state-litigation requirement. As long as posttaking compensation remedies are available, governments need not

Syllabus

fear that federal courts will invalidate their regulations as unconstitutional.  Pp. 20–23.

862 F. 3d 310, vacated and remanded.

ROBERTS, C. J., delivered the opinion of the Court, in which THOMAS, ALITO, GORSUCH, and KAVANAUGH, JJ., joined.  THOMAS, J., filed a concurring opinion.  KAGAN, J., filed a dissenting opinion, in which GINSBURG, BREYER, and SOTOMAYOR, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 17–647

ROSE MARY KNICK, PETITIONER *v.* TOWNSHIP OF SCOTT, PENNSYLVANIA, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

[June 21, 2019]

CHIEF JUSTICE ROBERTS delivered the opinion of the Court.

The Takings Clause of the Fifth Amendment states that "private property [shall not] be taken for public use, without just compensation." In *Williamson County Regional Planning Comm'n* v. *Hamilton Bank of Johnson City*, 473 U. S. 172 (1985), we held that a property owner whose property has been taken by a local government has not suffered a violation of his Fifth Amendment rights—and thus cannot bring a federal takings claim in federal court—until a state court has denied his claim for just compensation under state law.

The *Williamson County* Court anticipated that if the property owner failed to secure just compensation under state law in state court, he would be able to bring a "ripe" federal takings claim in federal court. See *id.*, at 194. But as we later held in *San Remo Hotel, L. P.* v. *City and County of San Francisco*, 545 U. S. 323 (2005), a state court's resolution of a claim for just compensation under state law generally has preclusive effect in any subsequent federal suit. The takings plaintiff thus finds himself in a

Catch-22: He cannot go to federal court without going to state court first; but if he goes to state court and loses, his claim will be barred in federal court.  The federal claim dies aborning.

The *San Remo* preclusion trap should tip us off that the state-litigation requirement rests on a mistaken view of the Fifth Amendment.  The Civil Rights Act of 1871, after all, guarantees "a federal forum for claims of unconstitutional treatment at the hands of state officials," and the settled rule is that "exhaustion of state remedies 'is *not* a prerequisite to an action under [42 U. S. C.] §1983.'" *Heck* v. *Humphrey*, 512 U. S. 477, 480 (1994) (quoting *Patsy* v. *Board of Regents of Fla.*, 457 U. S. 496, 501 (1982)).  But the guarantee of a federal forum rings hollow for takings plaintiffs, who are forced to litigate their claims in state court.

We now conclude that the state-litigation requirement imposes an unjustifiable burden on takings plaintiffs, conflicts with the rest of our takings jurisprudence, and must be overruled.  A property owner has an actionable Fifth Amendment takings claim when the government takes his property without paying for it.  That does not mean that the government must provide compensation in advance of a taking or risk having its action invalidated: So long as the property owner has some way to obtain compensation after the fact, governments need not fear that courts will enjoin their activities.  But it does mean that the property owner has suffered a violation of his Fifth Amendment rights when the government takes his property without just compensation, and therefore may bring his claim in federal court under §1983 at that time.

## I

Petitioner Rose Mary Knick owns 90 acres of land in Scott Township, Pennsylvania, a small community just north of Scranton.  Knick lives in a single-family home on

the property and uses the rest of the land as a grazing area for horses and other farm animals. The property includes a small graveyard where the ancestors of Knick's neighbors are allegedly buried. Such family cemeteries are fairly common in Pennsylvania, where "backyard burials" have long been permitted.

In December 2012, the Township passed an ordinance requiring that "[a]ll cemeteries . . . be kept open and accessible to the general public during daylight hours." The ordinance defined a "cemetery" as "[a] place or area of ground, whether contained on private or public property, which has been set apart for or otherwise utilized as a burial place for deceased human beings." The ordinance also authorized Township "code enforcement" officers to "enter upon any property" to determine the existence and location of a cemetery. App. 21–23.

In 2013, a Township officer found several grave markers on Knick's property and notified her that she was violating the ordinance by failing to open the cemetery to the public during the day. Knick responded by seeking declaratory and injunctive relief in state court on the ground that the ordinance effected a taking of her property. Knick did not seek compensation for the taking by bringing an "inverse condemnation" action under state law. Inverse condemnation is "a cause of action against a governmental defendant to recover the value of property which has been taken in fact by the governmental defendant." *United States* v. *Clarke*, 445 U. S. 253, 257 (1980) (quoting D. Hagman, Urban Planning and Land Development Control Law 328 (1971)). Inverse condemnation stands in contrast to direct condemnation, in which the government initiates proceedings to acquire title under its eminent domain authority. Pennsylvania, like every other State besides Ohio, provides a state inverse condemnation action. 26 Pa. Cons.

Stat. §502(c) (2009).[1]

In response to Knick's suit, the Township withdrew the violation notice and agreed to stay enforcement of the ordinance during the state court proceedings. The court, however, declined to rule on Knick's request for declaratory and injunctive relief because, without an ongoing enforcement action, she could not demonstrate the irreparable harm necessary for equitable relief.

Knick then filed an action in Federal District Court under 42 U. S. C. §1983, alleging that the ordinance violated the Takings Clause of the Fifth Amendment.[2] The District Court dismissed Knick's takings claim under *Williamson County* because she had not pursued an inverse condemnation action in state court. 2016 WL 4701549, *5–*6 (MD Pa., Sept. 8, 2016). On appeal, the Third Circuit noted that the ordinance was "extraordinary and constitutionally suspect," but affirmed the District Court in light of *Williamson County*. 862 F. 3d 310, 314 (2017).

We granted certiorari to reconsider the holding of *Williamson County* that property owners must seek just compensation under state law in state court before bringing a federal takings claim under §1983. 583 U. S. ___ (2018).

───────────

[1] A property owner in Ohio who has suffered a taking without compensation must seek a writ of mandamus to compel the government to initiate condemnation proceedings. See, *e.g.*, *State ex rel. Doner* v. *Zody*, 130 Ohio St. 3d 446, 2011-Ohio-6117, 958 N. E. 2d 1235.

[2] Section 1983 provides: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . ."

II

In *Williamson County*, a property developer brought a takings claim under §1983 against a zoning board that had rejected the developer's proposal for a new subdivision. *Williamson County* held that the developer's Fifth Amendment claim was not "ripe" for two reasons. First, the developer still had an opportunity to seek a variance from the appeals board, so any taking was therefore not yet final. 473 U. S., at 186–194. Knick does not question the validity of this finality requirement, which is not at issue here.

The second holding of *Williamson County* is that the developer had no federal takings claim because he had not sought compensation "through the procedures the State ha[d] provided for doing so." *Id.*, at 194. That is the holding Knick asks us to overrule. According to the Court, "if a State provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the [Takings] Clause until it has used the procedure and been denied just compensation." *Id.*, at 195. The Court concluded that the developer's federal takings claim was "premature" because he had not sought compensation through the State's inverse condemnation procedure. *Id.*, at 197.

The unanticipated consequences of this ruling were not clear until 20 years later, when this Court decided *San Remo*. In that case, the takings plaintiffs complied with *Williamson County* and brought a claim for compensation in state court. 545 U. S., at 331. The complaint made clear that the plaintiffs sought relief only under the takings clause of the State Constitution, intending to reserve their Fifth Amendment claim for a later federal suit if the state suit proved unsuccessful. *Id.*, at 331–332. When that happened, however, and the plaintiffs proceeded to federal court, they found that their federal claim was barred. This Court held that the full faith and credit

statute, 28 U. S. C. §1738, required the federal court to give preclusive effect to the state court's decision, blocking any subsequent consideration of whether the plaintiff had suffered a taking within the meaning of the Fifth Amendment. 545 U. S., at 347. The adverse state court decision that, according to *Williamson County*, gave rise to a ripe federal takings claim simultaneously barred that claim, preventing the federal court from ever considering it.

The state-litigation requirement relegates the Takings Clause "to the status of a poor relation" among the provisions of the Bill of Rights. *Dolan* v. *City of Tigard*, 512 U. S. 374, 392 (1994). Plaintiffs asserting any other constitutional claim are guaranteed a federal forum under §1983, but the state-litigation requirement "hand[s] authority over federal takings claims to state courts." *San Remo*, 545 U. S., at 350 (Rehnquist, C. J., concurring in judgment). Fidelity to the Takings Clause and our cases construing it requires overruling *Williamson County* and restoring takings claims to the full-fledged constitutional status the Framers envisioned when they included the Clause among the other protections in the Bill of Rights.

### III
### A

Contrary to *Williamson County*, a property owner has a claim for a violation of the Takings Clause as soon as a government takes his property for public use without paying for it. The Clause provides: "[N]or shall private property be taken for public use, without just compensation." It does not say: "Nor shall private property be taken for public use, without an available procedure that will result in compensation." If a local government takes private property without paying for it, that government has violated the Fifth Amendment—just as the Takings Clause says—without regard to subsequent state court proceedings. And the property owner may sue the gov-

ernment at that time in federal court for the "deprivation" of a right "secured by the Constitution." 42 U. S. C. §1983.

We have long recognized that property owners may bring Fifth Amendment claims against the Federal Government as soon as their property has been taken. The Tucker Act, which provides the standard procedure for bringing such claims, gives the Court of Federal Claims jurisdiction to "render judgment upon any claim against the United States founded either upon the Constitution" or any federal law or contract for damages "in cases not sounding in tort." 28 U. S. C. §1491(a)(1). We have held that "[i]f there is a taking, the claim is 'founded upon the Constitution' and within the jurisdiction of the Court of Claims to hear and determine." *United States* v. *Causby*, 328 U. S. 256, 267 (1946). And we have explained that "the act of taking" is the "event which gives rise to the claim for compensation." *United States* v. *Dow*, 357 U. S. 17, 22 (1958).

The Fifth Amendment right to full compensation arises at the time of the taking, regardless of post-taking remedies that may be available to the property owner. That principle was confirmed in *Jacobs* v. *United States*, 290 U. S. 13 (1933), where we held that a property owner found to have a valid takings claim is entitled to compensation as if it had been "paid contemporaneously with the taking"—that is, the compensation must generally consist of the total value of the property when taken, plus interest from that time. *Id.*, at 17 (quoting *Seaboard Air Line R. Co.* v. *United States*, 261 U. S. 299, 306 (1923)). We rejected the view of the lower court that a property owner is entitled to interest only when the government provides a particular remedy—direct condemnation proceedings— and not when the owner brings a takings suit under the Tucker Act. "The form of the remedy d[oes] not qualify the right. It rest[s] upon the Fifth Amendment." 290 U. S., at 16.

*Jacobs* made clear that, no matter what sort of procedures the government puts in place to remedy a taking, a property owner has a Fifth Amendment entitlement to compensation as soon as the government takes his property without paying for it.  Whether the government does nothing, forcing the owner to bring a takings suit under the Tucker Act, or whether it provides the owner with a statutory compensation remedy by initiating direct condemnation proceedings, the owner's claim for compensation "rest[s] upon the Fifth Amendment."

Although *Jacobs* concerned a taking by the Federal Government, the same reasoning applies to takings by the States.  The availability of any particular compensation remedy, such as an inverse condemnation claim under state law, cannot infringe or restrict the property owner's federal constitutional claim—just as the existence of a state action for battery does not bar a Fourth Amendment claim of excessive force.  The fact that the State has provided a property owner with a procedure that may subsequently result in just compensation cannot deprive the owner of his Fifth Amendment right to compensation under the Constitution, leaving only the state law right.  And that is key because it is the existence of the Fifth Amendment right that allows the owner to proceed directly to federal court under §1983.

*Williamson County* had a different view of how the Takings Clause works.  According to *Williamson County*, a taking does not give rise to a federal constitutional right to just compensation at that time, but instead gives a right to a state law procedure that will eventually result in just compensation.  As the Court put it, "if a State provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the [Takings] Clause until it has used the procedure and been denied just compensation."  473 U. S., at 195.  In the absence of a state remedy, the Fifth Amendment right to compensation

would attach immediately. But, under *Williamson County*, the presence of a state remedy qualifies the right, preventing it from vesting until exhaustion of the state procedure. That is what *Jacobs* confirmed could not be done.

Just two years after *Williamson County*, in *First English Evangelical Lutheran Church of Glendale* v. *County of Los Angeles*, 482 U. S. 304 (1987), the Court returned to the understanding that the Fifth Amendment right to compensation automatically arises at the time the government takes property without paying for it. Relying heavily on *Jacobs* and other Fifth Amendment precedents neglected by *Williamson County*, *First English* held that a property owner is entitled to compensation for the temporary loss of his property. We explained that "government action that works a taking of property rights necessarily implicates the 'constitutional obligation to pay just compensation.'" 482 U. S., at 315. Because of "the self-executing character" of the Takings Clause "with respect to compensation," a property owner has a constitutional claim for just compensation at the time of the taking. *Ibid.* (quoting 6 P. Nichols, Eminent Domain §25.41 (3d rev. ed. 1972)). The government's post-taking actions (there, repeal of the challenged ordinance) cannot nullify the property owner's existing Fifth Amendment right: "[W]here the government's activities have already worked a taking of all use of property, no subsequent action by the government can relieve it of the duty to provide compensation." 482 U. S., at 321.[3]

———————

   [3] *First English* distinguished *Williamson County* in a footnote, explaining that the case addressed only "whether the constitutional claim was ripe for review" before the State denied compensation. 482 U. S., at 320, n. 10. But *Williamson County* was based on the premise that there was no Fifth Amendment claim *at all* until the State denies compensation. Having rejected that premise, *First English* eliminated the rationale for the state-litigation requirement. The author of *First*

In holding that a property owner acquires an irrevocable right to just compensation immediately upon a taking, *First English* adopted a position Justice Brennan had taken in an earlier dissent. See *id.*, at 315, 318 (quoting and citing *San Diego Gas & Elec. Co.* v. *San Diego*, 450 U. S. 621, 654, 657 (1981) (Brennan, J., dissenting)).[4] In that opinion, Justice Brennan explained that "once there is a 'taking,' compensation *must* be awarded" because "[a]s soon as private property has been taken, whether through formal condemnation proceedings, occupancy, physical invasion, or regulation, the landowner has *already* suffered a constitutional violation." *Id.*, at 654.

*First English* embraced that view, reaffirming that "in the event of a taking, the compensation remedy is required by the Constitution." 482 U. S., at 316; see *ibid.*, n. 9 (rejecting the view that "the Constitution does not, of its own force, furnish a basis for a court to award money damages against the government" (quoting Brief for United States as *Amicus Curiae* 14)). Compensation under the Takings Clause is a remedy for the "constitutional violation" that "the landowner has *already* suffered" at the time of the uncompensated taking. *San Diego Gas & Elec. Co.*,

───────────

*English* later recognized that it was "not clear . . . that *Williamson County* was correct in demanding that . . . the claimant must seek compensation in state court before bringing a federal takings claim in federal court." *San Remo Hotel, L. P.* v. *City and County of San Francisco*, 545 U. S. 323, 349 (2005) (Rehnquist, C. J., concurring in judgment).

  [4]Justice Brennan was joined by Justices Stewart, Marshall, and Powell. The majority did not disagree with Justice Brennan's analysis of the merits, but concluded that the Court lacked jurisdiction to address the question presented. Justice Rehnquist, concurring on the jurisdictional issue, noted that if he were satisfied that jurisdiction was proper, he "would have little difficulty in agreeing with much of what is said in the dissenting opinion." 450 U. S., at 633–634. The Court reached the merits of the question presented in *San Diego* in *First English*, adopting Justice Brennan's view in an opinion by Chief Justice Rehnquist.

450 U. S., at 654 (Brennan, J., dissenting); see *First English*, 482 U. S., at 315.

A later payment of compensation may remedy the constitutional violation that occurred at the time of the taking, but that does not mean the violation never took place. The violation is the only reason compensation was owed in the first place. A bank robber might give the loot back, but he still robbed the bank. The availability of a subsequent compensation remedy for a taking without compensation no more means there never was a constitutional violation in the first place than the availability of a damages action renders negligent conduct compliant with the duty of care.

In sum, because a taking without compensation violates the self-executing Fifth Amendment at the time of the taking, the property owner can bring a federal suit at that time. Just as someone whose property has been taken by the Federal Government has a claim "founded . . . upon the Constitution" that he may bring under the Tucker Act, someone whose property has been taken by a local government has a claim under §1983 for a "deprivation of [a] right[] . . . secured by the Constitution" that he may bring upon the taking in federal court. The "general rule" is that plaintiffs may bring constitutional claims under §1983 "without first bringing any sort of state lawsuit, even when state court actions addressing the underlying behavior are available." D. Dana & T. Merrill, Property: Takings 262 (2002); see *McNeese* v. *Board of Ed. for Community Unit School Dist. 187*, 373 U. S. 668, 672 (1963) (observing that it would defeat the purpose of §1983 "if we held that assertion of a federal claim in a federal court must await an attempt to vindicate the same claim in a state court"); *Monroe* v. *Pape*, 365 U. S. 167, 183 (1961) ("The federal remedy is supplementary to the state remedy, and the latter need not be first sought and refused before the federal one is invoked."). This is as true for

takings claims as for any other claim grounded in the Bill of Rights.

### B

*Williamson County* effectively established an exhaustion requirement for §1983 takings claims when it held that a property owner must pursue state procedures for obtaining compensation before bringing a federal suit. But the Court did not phrase its holding in those terms; if it had, its error would have been clear. Instead, *Williamson County* broke with the Court's longstanding position that a property owner has a constitutional claim to compensation at the time the government deprives him of his property, and held that there can be no uncompensated taking, and thus no Fifth Amendment claim actionable under §1983, until the property owner has tried and failed to obtain compensation through the available state procedure. "[U]ntil it has used the procedure and been denied just compensation," the property owner "'has no claim against the Government' for a taking." 473 U. S., at 194–195 (quoting *Ruckelshaus* v. *Monsanto Co.*, 467 U. S. 986, 1018, n. 21 (1984)).

*Williamson County* drew that understanding of the Clause from *Ruckelshaus* v. *Monsanto Co.*, a decision from the prior Term. *Monsanto* did not involve a takings claim for just compensation. The plaintiff there sought to enjoin a federal statute because it effected a taking, even though the statute set up a special arbitration procedure for obtaining compensation, and the plaintiff could bring a takings claim pursuant to the Tucker Act if arbitration did not yield sufficient compensation. 467 U. S., at 1018. The Court rejected the plaintiff's claim because "[e]quitable relief is not available to enjoin an alleged taking of private property for a public use, duly authorized by law, when a suit for compensation can be brought against the sovereign subsequent to the taking." *Id.*, at 1016 (footnote

omitted). That much is consistent with our precedent: Equitable relief was not available because monetary relief was under the Tucker Act.

That was enough to decide the case. But *Monsanto* went on to say that if the plaintiff obtained compensation in arbitration, then "no taking has occurred and the [plaintiff] has no claim against the Government." *Id.*, at 1018, n. 21. Certainly it is correct that a fully compensated plaintiff has no further claim, but that is because the taking has been *remedied* by compensation, not because there was *no taking* in the first place. See *First English*, 482 U. S., at 316, n. 9. The statute in *Monsanto* simply required the plaintiff to attempt to vindicate its claim to compensation through arbitration before proceeding under the Tucker Act. The case offers no support to *Williamson County* in this regard, because Congress— unlike the States—is free to require plaintiffs to exhaust administrative remedies before bringing constitutional claims. See *McCarthy* v. *Madigan*, 503 U. S. 140, 144 (1992) ("Where Congress specifically mandates, exhaustion is required.").

*Williamson County* also relied on *Monsanto* when it analogized its new state-litigation requirement to federal takings practice, stating that "taking[s] claims against the Federal Government are premature until the property owner has availed itself of the process provided by the Tucker Act." 473 U. S., at 195. But the Court was simply confused. A claim for just compensation brought under the Tucker Act is not a prerequisite to a Fifth Amendment takings claim—it *is* a Fifth Amendment takings claim. A party who loses a Tucker Act suit has nowhere else to go to seek compensation for an alleged taking.

Other than *Monsanto*, the principal case to which *Williamson County* looked was *Parratt* v. *Taylor*, 451 U. S. 527 (1981). Like *Monsanto*, *Parratt* did not involve a takings claim for just compensation. Indeed, it was not a

takings case at all. *Parratt* held that a prisoner deprived of $23.50 worth of hobby materials by the rogue act of a state employee could not state a due process claim if the State provided adequate post-deprivation process. 451 U. S., at 543–544. But the analogy from the due process context to the takings context is strained, as *Williamson County* itself recognized. See 473 U. S., at 195, n. 14. It is not even possible for a State to provide pre-deprivation due process for the unauthorized act of a single employee. That is quite different from the taking of property *by the government* through physical invasion or a regulation that destroys a property's productive use.

The poor reasoning of *Williamson County* may be partially explained by the circumstances in which the state-litigation issue reached the Court. The Court granted certiorari to decide whether the Fifth Amendment entitles a property owner to just compensation when a regulation temporarily deprives him of the use of his property. (*First English* later held that the answer was yes.) As *amicus curiae* in support of the local government, the United States argued in this Court that the developer could not state a Fifth Amendment claim because it had not pursued an inverse condemnation suit in state court. Neither party had raised that argument before.[5] The Court then adopted the reasoning of the Solicitor General in an alternative holding, even though the case could have been resolved solely on the narrower and settled ground that no

——————

[5] The Solicitor General continues this tradition here, arguing for the first time as *amicus curiae* that state inverse condemnation claims "aris[e] under" federal law and can be brought in federal court under 28 U. S. C. §1331 through the *Grable* doctrine. Brief for United States as *Amicus Curiae* 22–24; see *Grable & Sons Metal Products*, *Inc.* v. *Darue Engineering & Mfg.*, 545 U. S. 308 (2005). Because we agree with the Solicitor General's principal contention that federal takings claims can be brought immediately under §1983, we have no occasion to consider his novel §1331 argument.

taking had occurred because the zoning board had not yet come to a final decision regarding the developer's proposal. In these circumstances, the Court may not have adequately tested the logic of the state-litigation requirement or considered its implications, most notably the preclusion trap later sprung by *San Remo*. That consequence was totally unanticipated in *Williamson County*.

The dissent, doing what respondents do not even dare to attempt, defends the original rationale of *Williamson County*—that there is no Fifth Amendment violation, and thus no Fifth Amendment claim, until the government denies the property owner compensation in a subsequent proceeding.[6] But although the dissent makes a more thoughtful and considered argument than *Williamson County*, it cannot reconcile its view with our repeated holdings that a property owner acquires a constitutional right to compensation at the time of the taking. See *supra*, at 7–11. The only reason that a taking would automatically entitle a property owner to the remedy of compensation is that, as Justice Brennan explained, with the uncompensated taking "the landowner has *already* suf-

————————

[6] The dissent thinks that respondents still press this theory. *Post*, at 6 n. 3. But respondents instead describe *Williamson County* as resting on an understanding not of the elements of a federal takings claim but of the scope of 42 U. S. C. §1983. They even go so far as to rewrite petitioner's question presented in such terms. Brief for Respondents i. For respondents, it does not matter whether a property owner has a Fifth Amendment claim at the time of a taking. What matters is that, in respondents' view, no constitutional violation occurs for purposes of §1983 until the government has subsequently denied compensation. That characterization has no basis in the *Williamson County* opinion, which did not even quote §1983 and stated that the Court's reasoning applied with equal force to takings by the Federal Government, not covered by §1983. 473 U. S., at 195. Respondents' attempt to recast the state-litigation requirement as a §1983-specific rule fails for the same reason as the logic of *Williamson County*—a property owner has a Fifth Amendment claim for a violation of the Takings Clause as soon as the government takes his property without paying for it.

fered a constitutional violation." *San Diego Gas & Elec. Co.*, 450 U. S., at 654 (dissenting opinion). The dissent here provides no more reason to resist that conclusion than did *Williamson County*.

C

The Court in *Williamson County* relied on statements in our prior opinions that the Clause "does not provide or require that compensation shall be actually paid in advance of the occupancy of the land to be taken. But the owner is entitled to reasonable, certain and adequate provision for obtaining compensation" after a taking. *Cherokee Nation* v. *Southern Kansas R. Co.*, 135 U. S. 641, 659 (1890). Respondents rely on the same cases in contending that uncompensated takings for which compensation is subsequently available do not violate the Fifth Amendment at the time of the taking. But respondents read those statements too broadly. They concerned requests for injunctive relief, and the availability of subsequent compensation meant that such an equitable remedy was not available. See *Regional Rail Reorganization Act Cases*, 419 U. S. 102, 107, 149 (1974) (reversing a decision "enjoin[ing]" the enforcement of a federal statute because "the availability of the Tucker Act guarantees an adequate remedy at law for any taking which might occur"); *Hurley* v. *Kincaid*, 285 U. S. 95, 99, 105 (1932) (rejecting a request to "enjoin the carrying out of any work" on a flood control project because the Tucker Act provided the plaintiff with "a plain, adequate, and complete remedy at law"). Simply because the property owner was not entitled to injunctive relief at the time of the taking does not mean there was no violation of the Takings Clause at that time.

The history of takings litigation provides valuable context. At the time of the founding there usually was no compensation remedy available to property owners. On occasion, when a legislature authorized a particular gov-

ernment action that took private property, it might also create a special owner-initiated procedure for obtaining compensation. But there were no general causes of action through which plaintiffs could obtain compensation for property taken for public use. Brauneis, The First Constitutional Tort: The Remedial Revolution in Nineteenth-Century State Just Compensation Law, 52 Vand. L. Rev. 57, 69–70, and n. 33 (1999).

Until the 1870s, the typical recourse of a property owner who had suffered an uncompensated taking was to bring a common law trespass action against the responsible corporation or government official. The official would then raise the defense that his trespass was lawful because authorized by statute or ordinance, and the plaintiff would respond that the law was unconstitutional because it provided for a taking without just compensation. If the plaintiff prevailed, he nonetheless had no way at common law to obtain money damages for a permanent taking— that is, just compensation for the total value of his property. He could obtain only retrospective damages, as well as an injunction ejecting the government from his property going forward. See *id.*, at 67–69, 97–99.

As Chancellor Kent explained when granting a property owner equitable relief, the Takings Clause and its analogs in state constitutions required that "a fair compensation must, in all cases, be *previously* made to the individuals affected." *Gardner* v. *Newburgh*, 2 Johns. Ch. 162, 166 (N. Y. 1816) (emphasis added). If a government took property without payment, a court would set aside the taking because it violated the Constitution and order the property restored to its owner. The Framers meant to prohibit the Federal Government from *taking* property without paying for it. Allowing the government to *keep* the property pending subsequent compensation to the owner, in proceedings that hardly existed in 1787, was not what they envisioned.

Antebellum courts, which had no means of compensating a property owner for his loss, had no way to redress the violation of an owner's Fifth Amendment rights other than ordering the government to give him back his property. See *Callender* v. *Marsh*, 18 Mass. 418, 430–431 (1823) ("[I]f by virtue of any legislative act the land of any citizen should be occupied by the public . . . , without any means provided to indemnify the owner of the property, . . . because such a statute would be directly contrary to the [Massachusetts takings clause]; and as no action can be maintained against the public for damages, the only way to secure the party in his constitutional rights would be to declare void the public appropriation."). But in the 1870s, as state courts began to recognize implied rights of action for damages under the state equivalents of the Takings Clause, they declined to grant injunctions because property owners had an adequate remedy at law. See, *e.g.*, *Stetson* v. *Chicago & Evanston R. Co.*, 75 Ill. 74, 78 (1874) ("What injury, if any, [the property owner] has sustained, may be compensated by damages recoverable by an action at law."); see also Brauneis, *supra*, at 97–99, 110–112. On the federal level, Congress enabled property owners to obtain compensation for takings in federal court when it passed the Tucker Act in 1887, and we subsequently joined the state courts in holding that the compensation remedy is required by the Takings Clause itself. See *First English*, 482 U. S., at 316 (collecting cases).

Today, because the federal and nearly all state governments provide just compensation remedies to property owners who have suffered a taking, equitable relief is generally unavailable. As long as an adequate provision for obtaining just compensation exists, there is no basis to enjoin the government's action effecting a taking. But that is because, as the Court explained in *First English*, such a procedure is a remedy for a taking that violated the Constitution, not because the availability of the procedure

somehow prevented the violation from occurring in the first place. See *supra*, at 9–11.[7]

The dissent contends that our characterization of *Cherokee Nation* effectively overrules "a hundred-plus years of legal rulings." *Post*, at 6 (opinion of KAGAN, J.). But under today's decision every one of the cases cited by the dissent would come out the same way—the plaintiffs would not be entitled to the relief they requested because they could instead pursue a suit for compensation. The premise of such a suit for compensation is that the property owner has already suffered a violation of the Fifth Amendment that may be remedied by money damages.[8]

*       *       *

We conclude that a government violates the Takings Clause when it takes property without compensation, and

––––––––––

[7] Among the cases invoking the *Cherokee Nation* language that the parties have raised, only one, *Yearsley* v. *W. A. Ross Constr. Co.*, 309 U. S. 18 (1940), rejected a demand for compensation. *Yearsley* concerned a state tort suit alleging a taking by a contractor building dikes for the Federal Government. In ruling for the contractors, we suggested that the taking did not violate the Fifth Amendment because the property owner had the opportunity to pursue a claim for just compensation under the Tucker Act. As explained, however, a claim for compensation brought under the Tucker Act *is* a claim for a violation of the Fifth Amendment; it does not prevent a violation from occurring. Regardless, *Yearsley* was right to hold that the contractors were immune from suit. Because the Tucker Act provides a complete remedy for any taking by the Federal Government, it "excludes liability of the Government's representatives lawfully acting on its behalf in relation to the taking," barring the plaintiffs from seeking any relief from the contractors themselves. *Id.*, at 22.

[8] The dissent also asserts that today's ruling "betrays judicial federalism." *Post*, at 15. But since the Civil Rights Act of 1871, part of "judicial federalism" has been the availability of a federal cause of action when a local government violates the Constitution. 42 U. S. C. §1983. Invoking that federal protection in the face of state action violating the Fifth Amendment cannot properly be regarded as a betrayal of federalism.

that a property owner may bring a Fifth Amendment claim under §1983 at that time. That does not as a practical matter mean that government action or regulation may not proceed in the absence of contemporaneous compensation. Given the availability of post-taking compensation, barring the government from acting will ordinarily not be appropriate. But because the violation is complete at the time of the taking, pursuit of a remedy in federal court need not await any subsequent state action. Takings claims against local governments should be handled the same as other claims under the Bill of Rights. *Williamson County* erred in holding otherwise.

## IV

The next question is whether we should overrule *Williamson County*, or whether *stare decisis* counsels in favor of adhering to the decision, despite its error. The doctrine of *stare decisis* reflects a judgment "that 'in most matters it is more important that the applicable rule of law be settled than that it be settled right.'" *Agostini* v. *Felton*, 521 U. S. 203, 235 (1997) (quoting *Burnet* v. *Coronado Oil & Gas Co.*, 285 U. S. 393, 406 (1932) (Brandeis, J., dissenting)). The doctrine "is at its weakest when we interpret the Constitution," as we did in *Williamson County*, because only this Court or a constitutional amendment can alter our holdings. *Agostini*, 521 U. S., at 235.

We have identified several factors to consider in deciding whether to overrule a past decision, including "the quality of [its] reasoning, the workability of the rule it established, its consistency with other related decisions, . . . and reliance on the decision." *Janus* v. *State, County, and Municipal Employees*, 585 U. S. ___, ___–___ (2018) (slip op., at 34–35). All of these factors counsel in favor of overruling *Williamson County*.

*Williamson County* was not just wrong. Its reasoning was exceptionally ill founded and conflicted with much of

our takings jurisprudence. See *supra*, at 12–14. Its key conclusion, which it drew from unnecessary language in *Monsanto*—that a property owner does not have a ripe federal takings claim until he has unsuccessfully pursued an initial state law claim for just compensation—ignored *Jacobs* and many subsequent decisions holding that a property owner acquires a Fifth Amendment right to compensation at the time of a taking. This contradiction was on stark display just two years later in *First English*.

The decision has come in for repeated criticism over the years from Justices of this Court and many respected commentators. See *San Remo*, 545 U. S., at 348 (Rehnquist, C. J., joined by O'Connor, Kennedy, and THOMAS, JJ., concurring in judgment); *Arrigoni Enterprises, LLC* v. *Durham*, 578 U. S. \_\_\_ (2016) (THOMAS, J., joined by Kennedy, J., dissenting from denial of certiorari); Merrill, Anticipatory Remedies for Takings, 128 Harv. L. Rev. 1630, 1647–1649 (2015); McConnell, *Horne* and the Normalization of Takings Litigation: A Response to Professor Echeverria, 43 Env. L. Rep. 10749, 10751 (2013); Friedman, Under the Law of Federal Jurisdiction: Allocating Cases Between Federal and State Courts, 104 Colum. L. Rev. 1211, 1264 (2004); Monaghan, State Law Wrongs, State Law Remedies, and the Fourteenth Amendment, 86 Colum. L. Rev. 979, 989 (1986). Even the academic defenders of the state-litigation requirement base it on federalism concerns (although they do not reconcile those concerns with the settled construction of §1983) rather than the reasoning of the opinion itself. See Echeverria, *Horne* v. *Department of Agriculture*: An Invitation To Reexamine "Ripeness" Doctrine in Takings Litigation, 43 Env. L. Rep. 10735, 10744 (2013); Sterk, The Demise of Federal Takings Litigation, 48 Wm. & Mary L. Rev. 251, 288 (2006).

Because of its shaky foundations, the state-litigation requirement has been a rule in search of a justification for

over 30 years. We eventually abandoned the view that the requirement is an element of a takings claim and recast it as a "prudential" ripeness rule. See *Horne* v. *Department of Agriculture*, 569 U. S. 513, 525–526 (2013); *Suitum* v. *Tahoe Regional Planning Agency*, 520 U. S. 725, 733–734 (1997). No party defends that approach here. See Brief for Respondents 37; Brief for United States as *Amicus Curiae* 19–20. Respondents have taken a new tack, adopting a §1983–specific theory at which *Williamson County* did not even hint. See n. 6, *supra*. The fact that the justification for the state-litigation requirement continues to evolve is another factor undermining the force of *stare decisis*. See *Janus*, 585 U. S., at ___ (slip op., at 23).

The state-litigation requirement has also proved to be unworkable in practice. *Williamson County* envisioned that takings plaintiffs would ripen their federal claims in state court and then, if necessary, bring a federal suit under §1983. But, as we held in *San Remo*, the state court's resolution of the plaintiff's inverse condemnation claim has preclusive effect in any subsequent federal suit. The upshot is that many takings plaintiffs never have the opportunity to litigate in a federal forum that §1983 by its terms seems to provide. That significant consequence was not considered by the Court in *Williamson County*.

The dissent argues that our constitutional holding in *Williamson County* should enjoy the "enhanced" form of *stare decisis* we usually reserve for statutory decisions, because Congress could have eliminated the *San Remo* preclusion trap by amending the full faith and credit statute. *Post*, at 17 (quoting *Kimble* v. *Marvel Entertainment, LLC*, 578 U. S. ___, ___ (slip op., at 8)). But takings plaintiffs, unlike plaintiffs bringing any other constitutional claim, would still have been forced to pursue relief under state law before they could bring suit in federal court. Congress could not have lifted that unjustified exhaustion requirement because, under *Williamson County*,

a property owner had no federal claim until a state court denied him compensation.

Finally, there are no reliance interests on the state-litigation requirement. We have recognized that the force of *stare decisis* is "reduced" when rules that do not "serve as a guide to lawful behavior" are at issue. *United States* v. *Gaudin*, 515 U. S. 506, 521 (1995); see *Alleyne* v. *United States*, 570 U. S. 99, 119 (2013) (SOTOMAYOR, J., concurring). Our holding that uncompensated takings violate the Fifth Amendment will not expose governments to new liability; it will simply allow into federal court takings claims that otherwise would have been brought as inverse condemnation suits in state court.

Governments need not fear that our holding will lead federal courts to invalidate their regulations as unconstitutional. As long as just compensation remedies are available—as they have been for nearly 150 years—injunctive relief will be foreclosed. For the same reason, the Federal Government need not worry that courts will set aside agency actions as unconstitutional under the Administrative Procedure Act. 5 U. S. C. §706(2)(B). Federal courts will not invalidate an otherwise lawful uncompensated taking when the property owner can receive complete relief through a Fifth Amendment claim brought under the Tucker Act.

In light of all the foregoing, the dissent cannot, with respect, fairly maintain its extreme assertions regarding our application of the principle of *stare decisis*.

\* \* \*

The state-litigation requirement of *Williamson County* is overruled. A property owner may bring a takings claim under §1983 upon the taking of his property without just compensation by a local government. The judgment of the United States Court of Appeals for the Third Circuit is vacated, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 17–647

_____

## ROSE MARY KNICK, PETITIONER *v.* TOWNSHIP OF SCOTT, PENNSYLVANIA, ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

[June 21, 2019]

JUSTICE THOMAS, concurring.

The Fifth Amendment's Takings Clause prohibits the government from "tak[ing]" private property "without just compensation." The Court correctly interprets this text by holding that a violation of this Clause occurs as soon as the government takes property without paying for it.

The United States, by contrast, urges us not to enforce the Takings Clause as written. It worries that requiring payment to accompany a taking would allow courts to enjoin or invalidate broad regulatory programs "merely" because the program takes property without paying for it. Brief for United States as *Amicus Curiae* 12. According to the United States, "there is a 'nearly infinite variety of ways in which government actions or regulations can affect property interests,'" and it ought to be good enough that the government "implicitly promises to pay compensation for any taking" if a property owner successfully sues the government in court. Supplemental Letter Brief for United States as *Amicus Curiae* 5 (Supp. Brief) (citing the Tucker Act, 28 U. S. C. §1491). Government officials, the United States contends, should be able to implement regulatory programs "without fear" of injunction or invalidation under the Takings Clause, "even when" the program is so far reaching that the officials "cannot determine whether a taking will occur." Supp. Brief 5.

This "sue me" approach to the Takings Clause is untenable. The Fifth Amendment does not merely provide a damages remedy to a property owner willing to "shoulder the burden of securing compensation" after the government takes property without paying for it. *Arrigoni Enterprises, LLC* v. *Durham*, 578 U. S. ___, ___ (2016) (THOMAS, J., dissenting from denial of certiorari) (slip op., at 2). Instead, it makes just compensation a "prerequisite" to the government's authority to "tak[e] property for public use." *Ibid.* A "purported exercise of the eminent-domain power" is therefore "invalid" unless the government "pays just compensation before or at the time of its taking." *Id.*, at ___ (slip op., at 3). If this requirement makes some regulatory programs "unworkable in practice," Supp. Brief 5, so be it—our role is to enforce the Takings Clause as written.

Of course, as the Court correctly explains, the United States' concerns about injunctions may be misplaced. *Ante,* at 15–18. Injunctive relief is not available when an adequate remedy exists at law. *E.g.*, *Monsanto Co.* v. *Geertson Seed Farms*, 561 U. S. 139, 156 (2010). And even when relief is appropriate for a particular plaintiff, it does not follow that a court may enjoin or invalidate an entire regulatory "program," Supp. Brief 5, by granting relief "beyond the parties to the case," *Trump* v. *Hawaii*, 585 U. S. ___, ___ (2018) (THOMAS, J., concurring) (slip op., at 6); see *id.*, at ___ (slip op., at 2) (expressing skepticism about "universal injunctions").

Still, "[w]hen the government repudiates [its] duty" to pay just compensation, its actions "are not only unconstitutional" but may be "tortious as well." *Monterey* v. *Del Monte Dunes at Monterey, Ltd.*, 526 U. S. 687, 717 (1999) (plurality opinion). I do not understand the Court's opinion to foreclose the application of ordinary remedial principles to takings claims and related common-law tort claims, such as trespass. I therefore join it in full.

# SUPREME COURT OF THE UNITED STATES

No. 17–647

## ROSE MARY KNICK, PETITIONER *v.* TOWNSHIP OF SCOTT, PENNSYLVANIA, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

[June 21, 2019]

JUSTICE KAGAN, with whom JUSTICE GINSBURG, JUSTICE BREYER, and JUSTICE SOTOMAYOR join, dissenting.

Today, the Court formally overrules *Williamson County Regional Planning Comm'n* v. *Hamilton Bank of Johnson City*, 473 U. S. 172 (1985). But its decision rejects far more than that single case. *Williamson County* was rooted in an understanding of the Fifth Amendment's Takings Clause stretching back to the late 1800s. On that view, a government could take property so long as it provided a reliable mechanism to pay just compensation, even if the payment came after the fact. No longer. The majority today holds, in conflict with precedent after precedent, that a government violates the Constitution whenever it takes property without advance compensation—no matter how good its commitment to pay. That conclusion has no basis in the Takings Clause. Its consequence is to channel a mass of quintessentially local cases involving complex state-law issues into federal courts. And it transgresses all usual principles of *stare decisis*. I respectfully dissent.

## I

Begin with the basics—the meaning of the Takings Clause. The right that Clause confers is not to be free from government takings of property for public purposes.

Instead, the right is to be free from those takings when the government fails to provide "just compensation." In other words, the government *can* take private property for public purposes, so long as it fairly pays the property owner. That precept, which the majority does not contest, comes straight out of the constitutional text: "[P]rivate property [shall not] be taken for public use, without just compensation." Amdt. 5. "As its language indicates, [the Takings Clause] does not prohibit the taking of private property, but instead places a condition on the exercise of that power." *First English Evangelical Lutheran Church of Glendale* v. *County of Los Angeles*, 482 U. S. 304, 314 (1987). And that constitutional choice accords with ancient principles about what governments do. The eminent domain power—the capacity to "take private property for public uses"—is an integral "attribute of sovereignty." *Boom Co.* v. *Patterson*, 98 U. S. 403, 406 (1879); see *Kohl* v. *United States*, 91 U. S. 367, 371 (1876) (The power is "essential to [the Government's] independent existence and perpetuity"). Small surprise, then, that the Constitution does not prohibit takings for public purposes, but only requires the government to pay fair value.

In that way, the Takings Clause is unique among the Bill of Rights' guarantees. It is, for example, unlike the Fourth Amendment's protection against excessive force— which the majority mistakenly proposes as an analogy. See *ante*, at 8. Suppose a law enforcement officer uses excessive force and the victim recovers damages for his injuries. Did a constitutional violation occur? Of course. The Constitution prohibits what the officer did; the payment of damages merely remedied the constitutional wrong. But the Takings Clause is different because it does not prohibit takings; to the contrary, it permits them provided the government gives just compensation. So when the government "takes and pays," it is not violating the Constitution at all. Put another way, a Takings

Clause violation has two necessary elements. First, the government must take the property. Second, it must deny the property owner just compensation. See *Horne* v. *Department of Agriculture*, 569 U. S. 513, 525–526 (2013) ("[A] Fifth Amendment claim is premature until it is clear that the Government has both taken property *and* denied just compensation" (emphasis in original)). If the government has not done both, no constitutional violation has happened. All this is well-trod ground. See, *e.g.*, *United States* v. *Jones*, 109 U. S. 513, 518 (1883); *Albert Hanson Lumber Co.* v. *United States*, 261 U. S. 581, 586 (1923). Even the majority (despite its faulty analogy) does not contest it.

Similarly well-settled—until the majority's opinion today—was the answer to a follow-on question: At what point has the government denied a property owner just compensation, so as to complete a Fifth Amendment violation? For over a hundred years, this Court held that advance or contemporaneous payment was not required, so long as the government had established reliable procedures for an owner to later obtain just compensation (including interest for any time elapsed). The rule got its start in *Cherokee Nation* v. *Southern Kansas R. Co.*, 135 U. S. 641 (1890), where the Tribe argued that a federal statute authorizing condemnation of its property violated the Fifth Amendment because the law did not require advance payment. The Court disagreed. It held that the Takings Clause "does not provide or require that compensation shall be actually paid in advance of the occupancy of the land to be taken" so long as the government made available to the owner "reasonable, certain and adequate provision for obtaining compensation" afterward. *Id.*, at 659. Decade after decade, the Court repeated that principle.[1] As another case put the point: The Takings Clause

—————————

[1] See also, *e.g.*, *Yearsley* v. *W. A. Ross Constr. Co.*, 309 U. S. 18, 21–22

does not demand "that compensation should be made previous to the taking" so long as "adequate means [are] provided for a reasonably just and prompt ascertainment and payment of the compensation." *Crozier* v. *Krupp A. G.*, 224 U. S. 290, 306 (1912). And the Court also made clear that a statute creating a right of action against the responsible government entity generally qualified as a constitutionally adequate compensatory mechanism. See, *e.g.*, *Williams* v. *Parker*, 188 U. S. 491, 502 (1903); *Yearsley* v. *W. A. Ross Constr. Co.*, 309 U. S. 18, 20–21 (1940).[2]

*Williamson County* followed from those decisions as night the day. The case began when a local planning commission rejected a property owner's development proposal. The owner chose not to seek compensation through the procedure the State had created—an "inverse condemnation" action against the commission. Instead, the owner sued in federal court alleging a Takings Clause violation under 42 U. S. C. §1983. Consistent with the century's worth of precedent I have recounted above, the Court found that no Fifth Amendment violation had yet occurred. See 473 U. S., at 195. The Court first recognized that "[t]he Fifth Amendment does not proscribe the

_____

(1940); *Hurley* v. *Kincaid*, 285 U. S. 95, 104 (1932); *Dohany* v. *Rogers*, 281 U. S. 362, 365 (1930); *Joslin Mfg. Co.* v. *Providence*, 262 U. S. 668, 677 (1923); *Albert Hanson Lumber Co.* v. *United States*, 261 U. S. 581, 587 (1923); *Hayes* v. *Port of Seattle*, 251 U. S. 233, 238 (1920); *Bragg* v. *Weaver*, 251 U. S. 57, 62 (1919); *Madisonville Traction Co.* v. *Saint Bernard Mining Co.*, 196 U. S. 239, 251–252 (1905); *Williams* v. *Parker*, 188 U. S. 491, 502 (1903); *Backus* v. *Fort Street Union Depot Co.*, 169 U. S. 557, 568 (1898); *Sweet* v. *Rechel*, 159 U. S. 380, 400–402 (1895).

  [2] In many of these cases, the Court held as well that if payment occurs later, it must include interest. See, *e.g.*, *id.*, at 407; *Albert Hanson Lumber Co.*, 261 U. S., at 586. That requirement flows from the constitutional demand for "just" compensation: As one of the early cases explained, the property owner must be placed "in as good position pecuniarily as he would have been if his property had not been taken." *Ibid.*

taking of property; it proscribes taking without just compensation." *Id.*, at 194. Next, the Court stated (citing no fewer than five precedents) that the Amendment does not demand that "compensation be paid in advance of, or contemporaneously with, the taking." *Ibid.* "[A]ll that is required," the Court continued, is that the State have provided "a 'reasonable, certain and adequate provision for obtaining compensation.'" *Ibid.* (quoting *Cherokee Nation*, 135 U. S., at 659). Here, the State had done so: Nothing suggested that the inverse condemnation procedure was inadequate. 473 U. S., at 196–197. So the property owner's claim was "not yet ripe": The owner could not "claim a violation of the [Takings] Clause until it [had] used the procedure and been denied." *Id.*, at 194–195.

So contrary to the majority's portrayal, *Williamson County* did not result from some inexplicable confusion about "how the Takings Clause works." *Ante*, at 8. Far from it. *Williamson County* built on a long line of decisions addressing the elements of a Takings Clause violation. The Court there said only two things remotely new. First, the Court found that the State's inverse condemnation procedure qualified as a "reasonable, certain and adequate" procedure. But no one in this case disputes anything to do with that conclusion—including that the equivalent Pennsylvania procedure here is similarly adequate. Second, the Court held that a §1983 suit could not be brought until a property owner had unsuccessfully invoked the State's procedure for obtaining payment. But that was a direct function of the Court's prior holdings. Everyone agrees that a §1983 suit cannot be brought before a constitutional violation has occurred. And according to the Court's repeated decisions, a Takings Clause violation does not occur until an owner has used the government's procedures and failed to obtain just compensation. All that *Williamson County* did was to put the period on an already-completed sentence about when a takings

claim arises.[3]

Today's decision thus overthrows the Court's long-settled view of the Takings Clause. The majority declares, as against a mountain of precedent, that a government taking private property for public purposes must pay compensation at that moment or in advance. See *ante*, at 6–7. If the government fails to do so, a constitutional violation has occurred, regardless of whether "reasonable, certain and adequate" compensatory mechanisms exist. *Cherokee Nation*, 135 U. S., at 659. And regardless of how many times this Court has said the opposite before. Under cover of overruling "only" a single decision, today's opinion smashes a hundred-plus years of legal rulings to smithereens.

## II

So how does the majority defend taking down *Williamson County* and its many precursors? Its decision rests on four ideas: a comparison between takings claims and other constitutional claims, a resort to the Takings Clause's

---

[3] Contrary to the majority's description, see *ante*, at 15, and n. 6, the respondents have exactly this view of *Williamson County* (and of the cases preceding it). The respondents discuss (as I do, see *supra*, at 3–4) the "long line of precedent" holding that "the availability of a reasonable, certain, and adequate inverse-condemnation procedure fulfills the duty" of a government to pay just compensation for a taking. Brief for Respondents 22–23. The respondents then conclude (again, as I do, see *supra*, at 4–6) that *Williamson County* "sound[ly]" and "straightforwardly applied that precedent to hold that a property owner who forgoes an available and adequate inverse-condemnation remedy has not been deprived of any constitutional right and thus cannot proceed under Section 1983." Brief for Respondents 22. (Again contra the majority, the respondents' only theory of §1983 is the one everyone agrees with—that a §1983 suit cannot be brought before a constitutional violation has occurred.) So while I appreciate the compliment, I cannot claim to argue anything novel or "dar[ing]" here. *Ante*, at 15. My argument is the same as the respondents', which is the same as *Williamson County*'s, which is the same as all the prior precedents'.

text, and theories about two lines of this Court's precedent. All are misguided. The majority uses the term "shaky foundations." *Ante*, at 21. It knows whereof it speaks.

The first crack comes from the repeated assertion (already encountered in the majority's Fourth Amendment analogy, see *supra*, at 2) that *Williamson County* treats takings claims worse than other claims founded in the Bill of Rights. See *ante*, at 6, 8, 11–12, 20. That is not so. The distinctive aspects of litigating a takings claim merely reflect the distinctive aspects of the constitutional right. Once again, a Fourth Amendment claim arises at the moment a police officer uses excessive force, because the Constitution prohibits that thing and that thing only. (Similarly, for the majority's other analogies, a bank robber commits his offense when he robs a bank and a tortfeasor when he acts negligently—because that conduct, and it alone, is what the law forbids.) Or to make the same point a bit differently, even if a government could compensate the victim in advance—as the majority requires here—the victim would still suffer constitutional injury when the force is used. But none of that is true of Takings Clause violations. That kind of infringement, as explained, is complete only after *two* things occur: (1) the government takes property, and (2) it fails to pay just compensation. See *supra*, at 2–3. All *Williamson County* and its precursors do is recognize that fact, by saying that a constitutional claim (and thus a §1983 suit) arises only after the second condition is met—when the property owner comes away from the government's compensatory procedure empty-handed. That is to treat the Takings Clause exactly as its dual elements require—and because that is so, neither worse nor better than any other right.

Second, the majority contends that its rule follows from the constitutional text, because the Takings Clause does not say "[n]or shall private property be taken for public

use, without an available procedure that will result in compensation." *Ante*, at 6. There is a reason the majority devotes only a few sentences to that argument. Because here's another thing the text does not say: "Nor shall private property be taken for public use, without advance or contemporaneous payment of just compensation, notwithstanding ordinary procedures." In other words, the text no more states the majority's rule than it does *Williamson County*'s (and its precursors'). As constitutional text often is, the Takings Clause is spare. It says that a government taking property must pay just compensation—but does not say through exactly what mechanism or at exactly what time. That was left to be worked out, consistent with the Clause's (minimal) text and purpose. And from 1890 until today, this Court worked it out *Williamson County*'s way, rather than the majority's. See *supra*, at 3–4. Under our caselaw, a government could use reliable post-taking compensatory mechanisms (with payment calculated from the taking) without violating the Takings Clause.

Third, the majority tries to explain away that mass of precedent, with a theory so, well, inventive that it appears in neither the petitioner's nor her 15-plus *amici*'s briefs. Don't read the decisions "too broadly," the majority says. *Ante*, at 16. Yes, the Court in each rejected a takings claim, instructing the property owner to avail herself instead of a government-created compensatory mechanism. But all the Court meant (the majority says) was that the plaintiffs had sought the wrong kind of relief: They could not get injunctions because the available compensatory procedures gave an adequate remedy at law. The Court still believed (so says the majority) that the cases involved constitutional violations. Or said otherwise (again, according to the majority), the Court still understood the Takings Clause to prohibit delayed payment.

Points for creativity, but that is just not what the deci-

sions say. Most of the cases involved requests for injunctions, but the equity/law distinction played little or no role in our analyses. Instead, the decisions addressed directly what the Takings Clause requires (or not). And as already shown, *supra*, at 3–4, they held that the Clause does not demand advance payment. Beginning again at the beginning, *Cherokee Nation* decided that the Takings Clause "does not provide or require that compensation shall be actually paid in advance." 135 U. S., at 659. In *Backus* v. *Fort Street Union Depot Co.*, 169 U. S. 557, 567–568 (1898), the Court declared that a property owner had no "constitutional right to have the amount of his compensation finally determined and paid before yielding possession." By the time of *Williams* v. *Parker*, 188 U. S., at 502, the Court could state that "it is settled by repeated decisions" that the Constitution allows the taking of property "prior to any payment." Similarly, in *Joslin Mfg. Co.* v. *Providence*, 262 U. S. 668, 677 (1923), the Court noted that "[i]t has long been settled that the taking of property . . . need not be accompanied or preceded by payment, but that the requirement of just compensation is satisfied when" there is a pledge of "reasonably prompt ascertainment and payment." In *Hurley* v. *Kincaid*, 285 U. S. 95, 104 (1932), the Court repeated that the "Fifth Amendment does not entitle [a property owner] to be paid in advance of the taking." I could go on—there are eighty more years to cover, and more decisions in the early years too—but by now you probably get the idea.

Well, just one more especially good demonstration. In *Yearsley* v. *W. A. Ross Constr. Co.*, 309 U. S. 18 (1940), the plaintiffs sought money damages for an alleged Takings Clause violation. For that reason, the Court's theory about suits seeking injunctions has no possible application. Still, the Court rejected the claim: The different remedy requested made no difference in the result. And yet more important: In refusing to find a Takings Clause

violation, the Court used the exact same reasoning as it had in all the cases requesting injunctions. Once again, the Court did not focus on the nature of the relief sought. It simply explained that the government had provided a procedure for obtaining post-taking compensation—and that was enough. "The Fifth Amendment does not entitle him [the owner] to be paid in advance of the taking," held the Court, quoting the last injunction case described above. *Id.*, at 21 (quoting *Hurley*, 285 U. S., at 104; brackets in original). Because the government had set up an adequate compensatory mechanism, the taking was "within [the government's] constitutional power." 309 U. S., at 22. Once again, the opposite of what the majority pronounces today.[4]

Fourth and finally, the majority lays claim to another line of decisions—involving the Tucker Act—but with no greater success. The Tucker Act waives the Federal Government's sovereign immunity and grants the Court of Federal Claims jurisdiction over suits seeking compensation for takings. See 28 U. S. C. §1491(a)(1). According to

---

[4] The majority's supposed best case to the contrary, *First English Evangelical Lutheran Church of Glendale* v. *County of Los Angeles*, 482 U. S. 304 (1987), is not so good, as is apparent from its express statement that it accords with *Williamson County*. See 482 U. S., at 320, n. 10. In *First English*, the Court held that a property owner was entitled to compensation for the temporary loss of his property, occurring while a (later-repealed) regulation was in effect. See *id.*, at 321. The Court made clear that a government's duty to compensate for a taking—including a temporary taking—arises from the Fifth Amendment, as of course it does. See *id.*, at 315. But the Court nowhere suggested that a Fifth Amendment violation happens even before a government denies the required compensation. (You will scan the majority's description of *First English* in vain for a quote to that effect—because no such quote exists. See *ante*, at 9–11.) To the contrary, the Court went out of its way to recognize the *Williamson County* principle that "no constitutional violation occurs until just compensation has been denied." 482 U. S., at 320, n. 10 (internal quotation marks omitted).

the majority, this Court's cases establish that such an action "*is* a claim for a violation of the Fifth Amendment"—that is, for a constitutional offense that has already happened because of the absence of advance payment. *Ante*, at 19, n. 7 (emphasis in original); see *ante*, at 13. But again, the precedents say the opposite. The Tucker Act is the Federal Government's equivalent of a State's inverse condemnation procedure, by which a property owner can obtain just compensation. The former, no less than the latter, *forestalls* any constitutional violation by ensuring that an owner gets full and fair payment for a taking. The Court, for example, stated in *United States* v. *Riverside Bayview Homes, Inc.*, 474 U. S. 121, 128 (1985), that "so long as [post-taking Tucker Act] compensation is available for those whose property is in fact taken, the governmental action is not unconstitutional." Similarly, we held in *Preseault* v. *ICC*, 494 U. S. 1, 4–5 (1990) that when "compensation is available to [property owners] under the Tucker Act[,] the requirements of the Fifth Amendment are satisfied." And again, in *Ruckelshaus* v. *Monsanto Co.*, 467 U. S. 986, 1016 (1984) we rejected a takings claim because the plaintiff could "seek just compensation under the Tucker Act" and "[t]he Fifth Amendment does not require that compensation precede the taking." All those decisions (and there are others) rested on the premise, merely reiterated in *Williamson County*, that the "availability of a suit for compensation against the sovereign will defeat a contention that the action is unconstitutional as a violation of the Fifth Amendment." *Larson* v. *Domestic and Foreign Commerce Corp.*, 337 U. S. 682, 697, n. 18 (1949).[5]

————————

[5]*Jacobs* v. *United States*, 290 U. S. 13 (1933), the Tucker Act case the majority cites to support its argument, says nothing different. The majority twice notes *Jacobs*' statement that a Tucker Act claim "rest[s] upon the Fifth Amendment." *Ante*, at 7–8 (quoting 290 U. S., at 16). And so it does, because the compensatory obligation that the Tucker

To the extent it deals with these cases (mostly, it just ignores them), the majority says only that they (like *Williamson County*) were "confused" or wrong. See *ante*, at 13, 19, n. 7. But maybe the majority should take the hint: When a theory requires declaring precedent after precedent after precedent wrong, that's a sign the theory itself may be wrong. The majority's theory is just that.

## III

And not only wrong on prior law. The majority's overruling of *Williamson County* will have two damaging consequences. It will inevitably turn even well-meaning government officials into lawbreakers. And it will subvert important principles of judicial federalism.

To begin with, today's decision means that government regulators will often have no way to avoid violating the Constitution. There are a "nearly infinite variety of ways" for regulations to "affect property interests." *Arkansas Game and Fish Comm'n* v. *United States*, 568 U. S. 23, 31 (2012). And under modern takings law, there is "no magic formula" to determine "whether a given government interference with property is a taking." *Ibid.* For that reason, a government actor usually cannot know in advance whether implementing a regulatory program will effect a taking, much less of whose property. Until today, such an official could do his work without fear of wrongdoing, in any jurisdiction that had set up a reliable means for property owners to obtain compensation. Even if some regulatory action turned out to take someone's property, the official would not have violated the Constitution. But no longer. Now, when a government undertakes land-use

_____

Act vindicates arises from—or "rests upon"—the Fifth Amendment. But that is a far cry from saying, as the majority does, that the Government has already violated the Fifth Amendment when the Tucker Act claim is brought—before the Government has denied fair compensation.

regulation (and what government doesn't?), the responsible employees will almost inescapably become constitutional malefactors. That is not a fair position in which to place persons carrying out their governmental duties.

Still more important, the majority's ruling channels to federal courts a (potentially massive) set of cases that more properly belongs, at least in the first instance, in state courts—where *Williamson County* put them. The regulation of land use, this Court has stated, is "perhaps the quintessential state activity." *FERC* v. *Mississippi*, 456 U. S. 742, 768, n. 30 (1982). And a claim that a land-use regulation violates the Takings Clause usually turns on state-law issues. In that respect, takings claims have little in common with other constitutional challenges. The question in takings cases is not merely whether a given state action meets federal constitutional standards. Before those standards can come into play, a court must typically decide whether, under state law, the plaintiff has a property interest in the thing regulated. See *Phillips* v. *Washington Legal Foundation*, 524 U. S. 156, 164 (1998); see also Sterk, The Demise of Federal Takings Litigation, 48 Wm. & Mary L. Rev. 251, 288 (2006) ("[I]f background state law did not recognize or create property in the first instance, then a subsequent state action cannot take property"). Often those questions—how does pre-existing state law define the property right?; what interests does that law grant?; and conversely what interests does it deny?—are nuanced and complicated. And not a one of them is familiar to federal courts.

This case highlights the difficulty. The ultimate constitutional question here is: Did Scott Township's cemetery ordinance "go[] too far" (in Justice Holmes's phrase), so as to effect a taking of Rose Mary Knick's property? *Pennsylvania Coal Co.* v. *Mahon*, 260 U. S. 393, 415 (1922). But to answer that question, it is first necessary to address an issue about background state law. In the Township's view,

the ordinance did little more than codify Pennsylvania common law, which (the Township says) has long required property owners to make land containing human remains open to the public. See Brief for Respondents 48; Brief for Cemetery Law Scholars as *Amici Curiae* 6–26. If the Township is right on that state-law question, Knick's constitutional claim will fail: The ordinance, on that account, didn't go far at all. But Knick contends that no common law rule of that kind exists in Pennsylvania. See Reply Brief 22. And if she is right, her takings claim may yet have legs. But is she? Or is the Township? I confess: I don't know. Nor, I would venture, do my colleagues on the federal bench. But under today's decision, it will be the Federal District Court for the Middle District of Pennsylvania that will have to resolve this question of local cemetery law.

And if the majority thinks this case is an outlier, it's dead wrong; indeed, this case will be easier than many. Take *Lucas* v. *South Carolina Coastal Council*, 505 U. S. 1003 (1992). There, this Court held that a South Carolina ban on development of beachfront property worked a taking of the plaintiff's land—unless the State's nuisance law already prohibited such development. See *id.*, at 1027–1030. The Court then—quite sensibly—remanded the case to the South Carolina Supreme Court to resolve that question. See *id.*, at 1031–1032. (And while spotting the nuisance issue, the Court may have overlooked other state-law constraints on development. In some States, for example, the public trust doctrine or public prescriptive easements limit the development of beachfront land. See Sterk, The Federalist Dimension of Regulatory Takings Jurisprudence, 114 Yale L. J. 203, 227 (2004).) Or consider *Stop the Beach Renourishment, Inc.* v. *Florida Dept. of Environmental Protection*, 560 U. S. 702 (2010). The federal constitutional issue there was whether a decision of the Florida Supreme Court relating to beachfront prop-

erty constituted a taking. To resolve that issue, though, the Court first had to address whether, under pre-existing Florida property law, "littoral-property owners had rights to future accretions and contact with the water superior to the State's right to fill in its submerged land." *Id.*, at 730. The Court bit the bullet and decided that issue itself, as it sometimes has to (though thankfully with the benefit of a state high court's reasoning). But there is no such necessity here—and no excuse for making complex state-law issues part of the daily diet of federal district courts.

State courts are—or at any rate, are supposed to be— the "ultimate expositors of state law." *Mullaney* v. *Wilbur*, 421 U. S. 684, 691 (1975). The corollary is that federal courts should refrain whenever possible from deciding novel or difficult state-law questions. That stance, as this Court has long understood, respects the "rightful independence of the state governments," "avoid[s] needless friction with state policies," and promotes "harmonious relation[s] between state and federal authority." *Railroad Comm'n of Tex.* v. *Pullman Co.*, 312 U. S. 496, 500–501 (1941). For that reason, this Court has promoted practices of certification and abstention to put difficult state-law issues in state judges' hands. See, *e.g.*, *Arizonans for Official English* v. *Arizona*, 520 U. S. 43, 77 (1997) (encouraging certification of "novel or unsettled questions of state law" to "hel[p] build a cooperative judicial federalism"); *Louisiana Power & Light Co.* v. *City of Thibodaux*, 360 U. S. 25, 28 (1959) (approving federal-court abstention in an eminent domain proceeding because such cases "turn on legislation with much local variation interpreted in local settings"). We may as well not have bothered. Today's decision sends a flood of complex state-law issues to federal courts. It makes federal courts a principal player in local and state land-use disputes. It betrays judicial federalism.

IV

Everything said above aside, *Williamson County* should stay on the books because of *stare decisis*. Adherence to precedent is "a foundation stone of the rule of law." *Michigan* v. *Bay Mills Indian Community*, 572 U. S. 782, 798 (2014). "[I]t promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." *Payne* v. *Tennessee*, 501 U. S. 808, 827 (1991). *Stare decisis*, of course, is "not an inexorable command." *Id.*, at 828. But it is not enough that five Justices believe a precedent wrong. Reversing course demands a "special justification—over and above the belief that the precedent was wrongly decided." *Kimble* v. *Marvel Entertainment, LLC*, 576 U. S. ___, ___ (2015) (slip op., at 8) (internal quotation marks omitted). The majority offers no reason that qualifies.

In its only real stab at a special justification, the majority focuses on what it calls the "*San Remo* preclusion trap." *Ante*, at 2. As the majority notes, this Court held in a post-*Williamson County* decision interpreting the full faith and credit statute, 28 U. S. C. §1738, that a state court's resolution of an inverse condemnation proceeding has preclusive effect in a later federal suit. See *San Remo Hotel, L. P.* v. *City and County of San Francisco*, 545 U. S. 323 (2005); *ante*, at 1–2, 5–6, 22. The interaction between *San Remo* and *Williamson County* means that "many takings plaintiffs never have the opportunity to litigate in a federal forum." *Ante*, at 22. According to the majority, that unanticipated result makes *Williamson County* itself "unworkable." *Ibid.*

But in highlighting the preclusion concern, the majority only adds to the case for respecting *stare decisis*—because that issue can always be addressed by Congress. When "correction can be had by legislation," Justice Brandeis once stated, the Court should let stand even "error[s on]

matter[s] of serious concern." *Square D Co.* v. *Niagara Frontier Tariff Bureau, Inc.*, 476 U. S. 409, 424 (1986) (quoting *Burnet* v. *Coronado Oil & Gas Co.*, 285 U. S. 393, 406 (1932) (dissenting)). Or otherwise said, *stare decisis* then "carries enhanced force." *Kimble*, 576 U. S., at \_\_\_ (slip op., at 8); see *South Dakota* v. *Wayfair, Inc.*, 585 U. S. \_\_\_, \_\_\_ (2018) (ROBERTS, C. J., dissenting) (slip op., at 2) (The *stare decisis* "bar is even higher" when Congress "can, if it wishes, override this Court's decisions with contrary legislation"). Here, Congress can reverse the *San Remo* preclusion rule any time it wants, and thus give property owners an opportunity—*after* a state-court proceeding—to litigate in federal court. The *San Remo* decision, as noted above, interpreted the federal full faith and credit statute; Congress need only add a provision to that law to flip the Court's result. In fact, Congress has already considered proposals responding to *San Remo*—though so far to no avail. See Brief for Congressman Steve King et al. as *Amici Curiae* 7. Following this Court's normal rules of practice means leaving the *San Remo* "ball[ in] Congress's court," so that branch can decide whether to pick it up. *Kimble*, 576 U. S., at \_\_\_ (slip op., at 8).[6]

And the majority has no other special justification. It says *Williamson County* did not create "reliance interests." *Ante,* at 23. But even if so, those interests are a *plus-factor* in the doctrine; when they exist, *stare decisis* becomes "superpowered." *Kimble*, 576 U. S., at \_\_\_ (slip op., at 10); *Payne*, 501 U. S., at 828 (*Stare decisis* concerns are "at their acme" when "reliance interests are involved"). The absence of reliance is not itself a reason for overruling

---

[6] Confronted with that point, the majority shifts ground. It notes that even if Congress eliminated the *San Remo* rule, takings plaintiffs would still have to comply with *Williamson County*'s "unjustified" demand that they bring suit in state court first. See *ante*, at 22. But that argument does not even purport to state a special justification. It merely reiterates the majority's view on the merits.

a decision. Next, the majority says that the "justification for [*Williamson County*'s] state-litigation requirement" has "evolve[d]." *Ante*, at 22. But to start with, it has not. The original rationale—in the majority's words, that the requirement "is an element of a takings claim," *ante*, at 22— has held strong for 35 years (including in the cases the majority cites), and is the same one I rely on today. See, *e.g., Horne*, 569 U. S., at 525–526 (quoting *Williamson County*'s rationale); *Suitum* v. *Tahoe Regional Planning Agency*, 520 U. S. 725, 734 (1997) (same); *supra*, at 2–3. And anyway, "evolution" in the way a decision is described has never been a ground for abandoning *stare decisis*. Here, the majority's only citation is to last Term's decision overruling a 40-year-old precedent. See *ante*, at 22 (citing *Janus* v. *State, County, and Municipal Employees*, 585 U. S. ___, ___ (2018) (slip op., at 23)). If that is the way the majority means to proceed—relying on one subversion of *stare decisis* to support another—we may as well not have principles about precedents at all.

What is left is simply the majority's view that *Williamson County* was wrong. The majority repurposes all its merits arguments—all its claims that *Williamson County* was "ill founded"—to justify its overruling. *Ante*, at 20–21. But the entire idea of *stare decisis* is that judges do not get to reverse a decision just because they never liked it in the first instance. Once again, they need a reason *other than* the idea "that the precedent was wrongly decided." *Halliburton Co.* v. *Erica P. John Fund, Inc.*, 573 U. S. 258, 266 (2014); see *supra*, at 16. For it is hard to overstate the value, in a country like ours, of stability in the law.

Just last month, when the Court overturned another longstanding precedent, JUSTICE BREYER penned a dissent. See *Franchise Tax Bd. of Cal.* v. *Hyatt*, 587 U. S. ___, ___ (2019). He wrote of the dangers of reversing legal course "only because five Members of a later Court" decide that an earlier ruling was incorrect. *Id.*, at ___ (slip op., at

13). He concluded: "Today's decision can only cause one to wonder which cases the Court will overrule next." *Ibid.* Well, that didn't take long. Now one may wonder yet again.